JOSÉ AMY ANGULO, demandante y recurrido, *v.* ADMINISTRACIÓN DEL DEPORTE HÍPICO y JUNTA HÍPICA DE PUERTO RICO, demandados y peticionarios.

*Número:* O-84-813 *Resuelto:* 17 de mayo de 1985

Roberto Schmidt Monge, Procurador General, Américo Serra, Procurador General Auxiliar, abogados de El Pueblo, peticionario; Manuel D. Herrero García, de Herrero, Castro y Porrata-Doria, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

Ante la opinión pública del estado de New York trascendió un escándalo de grandes proporciones, que involucró a algunos jinetes en el "arreglo de carreras" para propiciar determinados resultados. Tales irregularidades ocurrieron entre el 1974 al 1975. Se formularon acusaciones en el foro federal, que imputaban a varias personas su participación e instiga-

ción en prácticas ilícitas relacionadas con el hipismo en dicho estado. José Amy Angulo, jinete puertorriqueño imputado, solicitó y obtuvo inmunidad federal. Le fue conferida por el Departamento de Justicia federal, el 12 de septiembre de 1979. A cambio de ello, se convirtió en testigo principal del Estado en el caso criminal instado. Concluido el mismo, Amy Angulo, fue citado a comparecer compulsoriamente ante la Comisión Hípica de New York.

Esta entidad había iniciado una investigación sobre los mismos hechos. Durante el juicio criminal se vinculó a Amy Angulo con las prácticas ilícitas bajo investigación. *United States* v. *Errico*, 635 F.2d 152 (1980). Fue citado a comparecer por la importancia que revestía su testimonio. La Comisión de New York le citó para inquirirle sobre ese extremo. Compareció. Al ser abordado con preguntas específicas sobre su participación en las prácticas ilícitas antes aludidas, invocó el privilegio contra la autoincriminación bajo la Quinta Enmienda de la Constitución federal. La Comisión instó acción judicial para compelerle a responder a las preguntas. Dicho caso concluyó en el Tribunal Supremo de New York del Primer Distrito Judicial, el cual resolvió que Amy Angulo no venía obligado a testificar, fundado en la duda de si su inmunidad era de uso o transaccional. Véase *Application of Van Lindt*, 440 N.Y.S.2d 969 (1981).

Aun así, en el 1980, la Comisión Hípica de New York, decidió suspenderle indefinidamente su licencia como jinete en dicha jurisdicción, por las siguientes razones:

> *In light of Amy's refusal to testify,* he thereby failed to demonstrate his good faith. Our Board questions Amy's rehabilitation and would object to his being licensed by any jurisdication [*sic*] until he acts in good faith to resolve this matter. (Énfasis suplido.) *Exhibit* II, pág. 3.

En 1982, por imperativo circunstancial, Amy Angulo regresó a Puerto Rico. Solicitó licencia para montar ejemplares

al Administrador del Deporte Hípico, Juan A. Alves. El 18 de noviembre de ese año, el Administrador la denegó. Expresó:

Su solicitud de licencia de Jinete ha sido recibida. Puerto Rico funciona a base de reciprocidad con los Estados Unidos en materia de hipismo.

De acuerdo a su expediente, usted no es elegible para conced[é]rsele licencia de jinete en el Estado de New York a pesar de que anteriormente tenía licencia de jinete en dicho estado.

Tenemos información de que ésta le fue suspendida indefinidamente en 1980. *Es necesario para considerar su solicitud en Puerto Rico que traiga usted un certificado de "Good Standing" de el ultimo hipódromo en que participó. Dicho certificado no ha sido producido.* (Énfasis suplido.) *Exhibit* I, pág. 1.

Amy Angulo recurrió a la Junta Hípica. El miembro asociado, Frank Santaella se inhibió. El otro, Luis M. García Passalacqua, opinó separadamente que la Junta carecía de jurisdicción y por ende confirmaría al Administrador. De otra parte, el presidente del cuerpo, Lic. Jorge F. Romany, emitió opinión separada en la que expresó su inconformidad con la posición asumida por el Administrador Hípico. En vista de la composición de la Junta, división de criterios e inhibición de uno de sus miembros asociados, la decisión del Administrador fue confirmada el 4 de febrero de 1983. Una reconsideración fue denegada. Acudió el peticionario al Tribunal Superior, Sala de San Juan, mediante recurso de *certiorari*. El 7 de septiembre de 1983, dicho foro dictó sentencia confirmatoria. Aun así, el dictamen judicial intimó que la Junta Hípica tenía jurisdicción para entender en la apelación incoada. Apoyado en esa disgresión, Amy Angulo pidió reconsideración. Adujo que la Junta no había pasado juicio en los méritos sobre su apelación, debido a que uno de sus miembros entendía que dicho cuerpo carecía de jurisdicción. El tribunal reconsideró. Refirió el caso nuevamente a la Junta Hípica.

Allí, lamentablemente, se produjo la misma situación an-

terior. Santaella se inhibió. García Passalacqua, confirmó al Administrador Hípico. Esta vez trajo a colación una comunicación de uno de los miembros de la Comisión Hípica de New York, quien aparentemente fue consultado sobre la posible concesión de una licencia bajo probatoria al recurrido, para montar en Puerto Rico. Existe prueba en los autos que tiende a sugerir un interés de esa Comisión en el proceso deliberativo local. El presidente del cuerpo, licenciado Romany, nuevamente reafirmó que revocaría al Administrador Hípico. Manifestó que Amy Angulo era merecedor de una segunda oportunidad, atendido el tiempo transcurrido de diez (10) años desde los hechos y cuatro (4) de su suspensión como jinete. El 3 de enero de 1984, por división de criterios, se sostuvo una vez más la decisión del Administrador Hípico. Nuevamente Amy solicitó y le fue denegada una reconsideración. Recurrió otra vez al Tribunal Superior, Sala de San Juan. En esta ocasión, dicho foro, previo examen de la prueba y escritos de las partes, dictó sentencia el 25 de septiembre de 1984, que ordenaba al Administrador Hípico que le expediese una licencia de jinete una vez cumplidos los demás trámites administrativos requeridos por la ley y reglamentos. El tribunal destacó varios aspectos, que bajo el crisol de la Constitución, configuraban un agravio impermisible. En primer término, observó que Amy Angulo satisfacía todos los requisitos consignados en el Art. 7(2) de la Ley Hípica, a saber:

. . . El Administrador Hípico no concederá licencias de entrenador, cuadrero, ayudante de cuadrero y jinete a persona alguna que no compruebe, mediante certificación médica obtenida en una unidad de Salud Pública, que está en buenas condiciones de salud. El Administrador Hípico no concederá licencia alguna a personas que hubiesen sido convictas por tráfico, posesión o uso de drogas narcóticas o [sustancias controladas o de cualquiera otras o por cualquier delito *felony*] que implique depravación moral. 15 L.P.R.A. sec. 187(2).

En segundo lugar, estimó —bajo el supuesto de existir re-

ciprocidad— que la misma no podía prevalecer contra los derechos constitucionales de Amy Angulo, a un debido proceso de ley, a no ser privado absoluta e irrazonablemente de su propiedad en términos de su empleo, a su derecho inalienable a procurar su sustento y el de su familia y a no ser castigado *cruelmente* mediante una pena indefinida y desproporcionada a la ofensa cometida. A solicitud del Administrador Hípico acordamos revisar.

## II

La adjudicación del presente caso suscita variadas y complicadas cuestiones de índole constitucional, las cuales bajo una norma de sabia abstención, se pueden superar sin necesidad de un decreto sobre el particular. *Milán Rodríguez* v. *Muñoz*, 110 D.P.R. 610, 618–619 (1981).

Examinada la suspensión de Amy Angulo por la Comisión Hípica de New York, notamos que la misma constituyó un ataque colateral al dictamen emitido por el Tribunal Supremo del Primer Distrito Judicial de dicho Estado. Advertimos que el peticionario obtuvo la protección de ese Tribunal a los efectos de no declarar. La sanción impuesta pretende compelerle a declarar en violación a su derecho constitucional a la no autoincriminación que se le reconoció. Véase *Application of Van Lindt*, supra, pág. 972.

Ello configura a su vez una situación peculiar. Amy Angulo no ha sido convicto. Tampoco se le ha celebrado vista alguna donde se le haya condenado por haber incurrido en prácticas ilícitas relacionadas con el hipismo en Puerto Rico o en el exterior. En este sentido, no es pertinente la discusión relativa al Art. 225, inciso 7 del Reglamento Hípico (*Exhibit* XII, pág. 43.), en cuanto sanciona a los jinetes por la comisión de faltas en hipódromos del exterior. Igual situación plantea el Art. 238 del mismo reglamento (*Exhibit* XII, pág. 44.), al disponer que si se suspende un jinete local en el extranjero, ipso facto se le cancela su licencia en Puerto Rico

por el término de la suspensión en el exterior. Los autos están saturados de menciones que por vía de referencia aluden a dicho supuesto. Ello no es suficiente para una denegatoria de licencia. *Morales Merced* v. *Tribunal Superior*, 93 D.P.R. 423, 428, 432 (1966). Repetimos, el peticionario no ha sido suspendido por razones compatibles con el mandato del Tribunal Supremo del Primer Distrito Judicial. En tal sentido, en el descargo de nuestra función judicial de convalidación de aquellos actos ejecutados bajo la cláusula de entera fe y crédito (*full faith & credit*) es nuestro deber darle pleno reconocimiento y validez a tal decisión. *Roth* v. *Roth*, 99 D.P.R. 25, 28–29 (1970); *Lichtig* v. *Lichtig*, 81 D.P.R. 737, 742–745 (1960). No ocurre lo mismo, sin embargo, con la suspensión emitida por la Comisión Hípica de New York. Hemos hecho claro que no pueden hacerse valer en Puerto Rico sentencias, dictámenes o decretos que hayan sido efectuados en violación al debido proceso de ley, aun cuando tales actos estén concebidos en relación con otras jurisdicciones domésticas. *Roseberry* v. *Registrador*, 114 D.P.R. 743 (1983); *Ef. Litográficos* v. *Nat. Paper & Type Co.*, 112 D.P.R. 389, 403 (1982). La cláusula de "entera fe y crédito" consagrada en la sección primera del Art. IV de la Constitución federal "[n]o opera *ex proprio vigore* . . . está sujeta a excepciones". *Roseberry* v. *Registrador*, supra, pág. 747.

■ Después de todo, el debido proceso de ley, encarna la esencia de nuestro sistema de justicia. Su prédica compendia elevados principios y valores que reflejan nuestra vida en sociedad y el grado de civilización alcanzado. Es herencia de nuestros antepasados, fruto de nuestro esfuerzo colectivo y nuestra vocación democrática de pueblo. Preámbulo a la Constitución del Estado Libre Asociado; 2 Diario de Sesiones de la Convención Constituyente 1101, 1104, 1501–1509 (1952); 3 Diario de Sesiones, *supra*, págs. 1571, 1626–1628, 1696, 2296; 4 Diario de Sesiones, *supra*, págs. 2345–2347, 2356, 2430, 2448, 2565, 2572.

 El derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas. El destino incierto de la frustrada Sec. 20 de nuestra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado. Véanse: Constitución de Estados Unidos de América, Emda. Art. IX; Constitución del Estado Libre Asociado, Art. II, Sec. 19; *Ortiz Cruz* v. *Junta Hípica*, 101 D.P.R. 791, 794–795 (1973). 4 Diario de Sesiones, *supra*, págs. 2530–2532, 2539–2543, 2575–2577. En efecto, la Convención Constituyente tuvo muy presente expandir el alcance del concepto "vida" como derecho inalienable del hombre.[1] Uno de sus ilustres delegados, expresó en aquella ocasión la siguiente visión:

> . . . La palabra "vida" contiene toda una serie de derechos aparte del de la simple respiración, que no están incluidos necesariamente en la palabra "libertad" ni en la palabra "propiedad". O sea, de eliminarse la palabra "vida" de esta frase tan consagrada en la historia de este gran derecho, se estaría haciendo un cambio fundamental en cuanto [a eso], principalmente ahora que se está expandiendo el área de los derechos humanos y ahora que se está reconociendo una segunda carta de derechos a la anterior clásica, tipo siglo XVII, y se están significando como derechos del hombre también en este documento, el derecho a la educación, el derecho al trabajo, el derecho a un nivel adecuado de vida.
>
> Todos estos derechos que abonan y que son necesarios

---

[1] La redacción final de la Sec. 7 de la Carta de Derechos consagró así su reconocimiento:

"*Se reconoce como derecho fundamental del ser humano el derecho a la vida,* a la libertad y al disfrute de la propiedad. No existirá la pena de muerte. Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. No se aprobarán leyes que menoscaben las obligaciones contractuales. Las leyes determinarán un mínimo de propiedad y pertenencias no sujetas a embargo." (Énfasis suplido.)

para el debido desenvolvimiento de la personalidad humana están comprendidos fundamentalmente en la palabra "vida". *Y es la cláusula de debido proceso de ley, ciertamente, el principal escudo histórico para su defensa.* (Énfasis suplido.) (Hon. José Trías Monge), 2 Diario de Sesiones, *supra,* págs. 1503–1504.

■ Sobre este último extremo, al igual que el foro de instancia, nos preocupa el impacto de la pena impuesta —suspensión indefinida— con los medios de subsistencia de Amy Angulo. En la vista declaró que no sabía realizar ningún otro oficio al de montar caballos. Durante cuatro (4) años ha permanecido privado de su única fuente principal de ingresos. De ordinario ello afecta a terceros inocentes, como los miembros del núcleo familiar, cédula vital de nuestra comunidad. La pena indefinida podría constituir y convertirse propiamente en un castigo cruel e inusitado, proscrito por la Constitución. *Espinosa* v. *Ramírez, Alcaide de Cárcel,* 72 D.P.R. 901 (1951). En el ejercicio de esta última función, nos compete velar porque, conforme el Art. II, Sec. 12 de nuestra Constitución, no se impongan castigos crueles e inusitados. *Pueblo* v. *Pérez Zayas,* 116 D.P.R. 197 (1985). Así, hemos rechazado "la tesis de castigo perpetuo" en nuestra jurisdicción. *García* v. *Luciano,* 115 D.P.R. 628, 631 (1984).

La importancia de lo expuesto no puede subestimarse. La disparidad impermisible en la aplicación de la pena lo comprueba. *Pueblo* v. *Pérez Zayas,* supra. La comparación de las sanciones impuestas a los jinetes Amy Angulo y Jacinto Vázquez, arroja que este último fue suspendido sólo un (1) año en relación con los mismos hechos. (Véase voto separado emitido por el Presidente de la Junta Hípica, Lic. Jorge F. Romany.) La celebración de una vista donde pudieran esclarecerse las interrogantes que pudiera haber suscitado la conducta de Amy Angulo en 1974, se confrontan con el transcurso del tiempo. Han pasado once (11) años. Al momento de los sucesos tenía diecinueve (19) años. La pretensión de convertir tal conducta en esquema moral contemporáneo de sus

atributos éticos, se aproxima peligrosamente al ámbito de la arbitrariedad y por ende, podría conducir a un resultado irrazonable. La integridad y solvencia moral del peticionario no ha sido cuestionada, ni rebatida en el proceso, fuera de tal incidente aislado. Véase *Morales Merced* v. *Tribunal Superior*, supra, págs. 430–432.

Aunque inconcluso, Amy Angulo rindió un servicio a la sociedad mediante el testimonio ofrecido.

*En las circunstancias fácticas expuestas, la suma total de señalamientos e interrogantes apuntan hacia la confirmación de la sentencia recurrida.*