HONS. NICOLÁS NOGUERAS, HIJO y ROLANDO A. SILVA, en su carácter de miembros del SENADO DE PUERTO RICO, apelados, *v.* RAFAEL HERNÁNDEZ COLÓN, GOBERNADOR DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, apelante.

*Número:* AC-90-421          *Resuelto:* 28 de junio de 1991

*Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General, y Anabelle Rodríguez, Procuradora General Auxiliar*, abogados del apelante; *Nicolás Nogueras, Hijo, pro se.*

## RESOLUCIÓN

A la solicitud de intervención presentada en este caso, no ha lugar.

Lo acordó el Tribunal y certifica el señor Secretario General Interino. Los Jueces Asociados Señores Negrón García y Rebollo López disintieron con opiniones escritas.

(*Fdo.*) Heriberto Pérez Ruiz
*Secretario General Interino*

– O –

Opinión disidente del Juez Asociado Señor Negrón García.

Parafraseando a José Ortega y Gasset, toda decisión es primero una intención y luego una realización. Con aquélla midamos ésta. La obra misma nos revela a la par su norma y su pecado.

Como *norma*, la opinión y sentencia mayoritaria de 16 de enero de 1991 es NULA *ab initio. SI BIEN EL TAMAÑO DEL PAPEL ES LEGAL (8-1/2 x 14 PULGADAS), FUE DICTADA SIN JURISDICCIÓN.* Sostener que es firme y goza de autoridad de *cosa juzgada* es concurrir con lo que "decían pintorescamente los juristas medioevales, 'hace[r] de lo blanco, negro, y de lo cuadrado, redondo'". Mauro Cappelletti, *La Responsabilidad de los Jueces*, Argentina, JUS. Fundación para la Investigación de las Ciencias Jurídicas, 1988, pág. 32.

Su *pecado*, la INJUSTICIA, producto de una increíble *transmutación judicial.* Aun cuando la controversia jurídica giraba *sólo* en torno a la *reiterada tardanza del Pri-*

*mer Ejecutivo* frente al poder de confirmación del Senado en nominar jueces, la mayoría del Tribunal movió ese eje central y decidió menoscabar los derechos en ausencia de todos los jueces de primera instancia. *Ni uno de ellos estuvo presente.* Fueron y siguen siendo los *únicos* afectados —*verdaderas partes indispensables*— según lo acreditan los Jueces Superiores interventores, Hons. Arnaldo López Rodríguez, Ángel G. Hermida, Guillermo Arbona Lago, Luis Muñiz Argüelles, Pedro López Oliver, Ángel González Román, Hiram Sánchez Martínez y Zulma Zayas Puig. El "asunto es de orden tan relevante y *vital* que *puede presentarse en apelación por primera vez* o aun *suscitarse* por este Tribunal *sua sponte*". (Énfasis suplido.) *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 603 (1983).

El siguiente extracto justifica su *legitimación:*

> El interés de los interventores en los límites constitucionales establecidos por la *Opinión y Sentencia* emitida en autos es sumamente palpable. Sus nombramientos han sido menoscabados sin notificación, oportunidad de vista, oportunidad de ser oídos y sin que realmente existiese una causa y controversia sobre el asunto de la continuidad en el desempeño de los cargos de los jueces nombrados al amparo del estado de derecho previo a la Ley Núm. 17. Ni los jueces comparecientes ni ninguno de sus pares recibieron notificación alguna de la presentación del presente pleito, su apelación o de la resolución de una controversia que afectaría los nombramientos que le fueron extendidos. Solicitud de intervención, págs. 2–3.

El *planteamiento* rebasa el daño, claro y palpable, causado al interés constitucional individual propietario de los *interventores* Jueces, Hons. López Rodríguez, *et al.* Los términos de los cargos de éstos no vencerán hasta de aquí a varios años. *Es obvio, pues, que debemos tomar sus comparecencias en defensa de los demás jueces del Tribunal de Primera Instancia* y del principio de *INDEPENDENCIA JUDICIAL*, sobre todo en abono de aquellos magistrados para quienes el *perjuicio* de la decisión mayoritaria es *real e inmediato.* Nos referimos a un número sustancial de jue-

ces a quienes en los meses venideros —y durante el próximo año— se les vencerán sus términos y, aunque insertos espiritualmente en el caso, se abstuvieron de unirse en su origen y subsiguientemente comparecer a defenderse.

Esa postura prudencial es perfectamente comprensible. La opinión mayoritaria les creó una seria encrucijada en un ambiente denso y de reproches. La solicitud de intervención de los Jueces, Hons. López Rodríguez, *et al.*, se presentó en este Foro el 21 de febrero de 1991. El 25 de febrero de 1991 el Gobernador, Hon. Rafael Hernández Colón, en su mensaje anual a la Asamblea Legislativa —al anunciar legislación al respecto— criticó duramente la Judicatura del país. Aludió a lo que a juicio suyo era el "clima de presiones, recriminaciones y comportamientos *gremiales*", "invitando a deponer la retórica inflamatoria que algunos jueces lanzaban al país desde sus estrados, deteriorando con su insólito comportamiento, el armónico y mutuamente respetuoso cumplimiento de las respectivas funciones de las ramas gubernamentales". Mensaje, pág. 24.

En estas circunstancias, ¿cómo podríamos negarles la intervención a los Jueces, Hons. López Rodríguez, *et al.*, y exigirles que otros aisladamente demandaran expresamente al Gobernador, Hon. Rafael Hernández Colón? ¿No es dicho Primer Ejecutivo precisamente el poder que decidirá si los renomina o sustituye? ¿Vamos a ignorar el efecto disuasivo (*chilling effect*) o contraproducente que de su faz generaría semejante acción contra el Gobernador?

En su proyección práctica, la opinión mayoritaria del Tribunal no admite medias tintas. Si bien la intervención de los jueces en el caso de autos es *imposponible*, dejar sin efecto dicha decisión es un *imperativo*. La lista de miembros de la Judicatura *inminentemente afectados* es impresionante:

| Tribunal Superior | Expiración Término |
|---|---|
| 1. Julio Berríos Jiménez | 14-junio-1991 |
| 2. José A. Torres Caraballo | 6-sept.-1991 |
| 3. Antonio R. Barceló Moreno | 22-mayo-1992 |
| 4. Ángel D. Martínez Del Valle | 22-mayo-1992 |
| 5. Rafael Contreras Estelritz | 11-sept.-1992 |

| Tribunal de Distrito | Expiración Término |
|---|---|
| 1. Luis Rosario Villanueva | 1-mayo-1991 |
| 2. Raymond J. Russo Correa | 1-mayo-1991 |
| 3. Nicanor Vázquez Torres | 11-abril-1992 |
| 4. Gladys Nevárez Andino | 12-abril-1992 |
| 5. Juan Ortiz Torrales | 12-abril-1992 |
| 6. Gabriel A. García Rosario | 17-abril-1992 |
| 7. Manuel Acevedo Hernández | 10-mayo-1992 |
| 8. Kalil Baco Viera | 10-mayo-1992 |
| 9. Alma S. De León Ostolaza | 10-mayo-1992 |
| 10. Rafael Riefkohl Marcano | 12-sept.-1992 |

| Jueces Municipales | Expiración Término |
|---|---|
| 1. César D. Nazario Almodóvar | 3-abril-1991 |
| 2. Myrthia Miranda Ríos | 22-mayo-1991 |
| 3. Leocadio Castillo Méndez | 10-sept.-1991 |

Además, rescatar la cláusula de continuidad e interpretarla correctamente *es crucial al buen funcionamiento del Poder Judicial*. El asunto revive nuevamente la polémica en torno al *término de duración del cargo de los jueces* como una de las salvaguardas del principio rector de la *independencia judicial*, concepto muchas veces malentendido por algunos ciudadanos, políticos, abogados, ex jueces

y jueces. "La naturaleza y dinámica humanas son fluidas y sumamente complejas. Así pues, en una sociedad pluralista existe todo tipo de personalidades —simplistas y complicadas, inteligentes y cerradas, objetivas y prejuiciadas, fanáticas y tolerantes— portavoces que responden a una gama de intereses ideológicos particulares o de grupos, tanto profesionales como partidistas. Dependiendo del grado de convulsión social y la crudeza de las luchas de las distintas tendencias en determinado momento, el abanico de percepciones erróneas o distorsionadas y voces hostiles, aun entre y contra personas honorables y de prestigio, varía." *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 312 (1980).

Por su naturaleza, concretizar la independencia judicial no ha sido tarea fácil; por el contrario, ha generado fricciones entre los poderes constitucionales. Véanse: *In re Conferencia Judicial*, 122 D.P.R. 358 (1988), y 122 D.P.R. 420 (1988) (Resoluciones y Votos de 13 de julio, y 10, 26 y 28 de octubre de 1988), donde todos los magistrados de este Foro expusieron sus respectivos criterios.

Matizada con estos antecedentes, desconocemos el resultado de las propuestas generadas en la Conferencia Judicial y si el producto final será —más que profusión de palabras y de proyectos— legislación que, una vez implantada, verdadera y realmente adelante al máximo la *independencia judicial* en sus elementos *concretos:* legales, funcionales y orgánicos, personales, administrativos y morales. A fin de cuentas, más que cambios estructurales, lo determinante será el elemento humano. "La independencia *individual* del juez es el secreto de su dignidad y la clave de una independencia judicial unificada." (Énfasis suplido.) *In re Conferencia Judicial*, 122 D.P.R. 420, 449 (1988), voto explicativo.

Y esa independencia individual es la llave procesal que los jueces interventores *pro se* e *ius tercii* desean utilizar para abrir las puertas de este Tribunal. Han transcurrido

cuatro (4) meses más desde esa comparecencia. En justicia, nuestra obligación *ahora*, sin más demora, es adjudicar favorablemente sus reclamos "de conformidad con el Derecho aplicable, con *absoluta ecuanimidad*, y sin preocupar[nos d]el reconocimiento que pueda darse a [nuestra] labor, *ni la crítica injusta*". (Énfasis suplido.) Canon XI de Ética Judicial, 4 L.P.R.A. Ap. IV-A. "La fortaleza del Juez —escribe PLAZA— no puede padecer, por la mera posibilidad de que sus fallos disgusten a los litigantes, *puedan contrariar la ambición de los grandes, suscitar la rencorosa animadversión de los pequeños*, o favorecer la crítica, a veces despiadada, de los perdidosos; él no ha de ser perseguidor de popularidad, sino simplemente inspirador de confianza, suscitador de respeto, y, a la postre, la comunidad viene a ser tributaria de tales sentimientos." (Escolios omitidos y énfasis suplido.) F. Soto Nieto, *Compromiso de Justicia*, Madrid, Ed. Montecorvo, 1977, pág. 36.

# I

El trasfondo procesal del caso es sencillo. Pocas veces la ruta decisoria a seguirse ha sido tan clara. La solicitud de *mandamus* presentada por los senadores, Hons. Nicolás Nogueras, Hijo, y Rolando Silva, *se fundó en la conocida inacción y tardanza del Gobernador, Hon. Rafael Hernández Colón*, en renominar o sustituir a varios jueces con términos de nombramientos vencidos y que *continuaban ejerciendo sus cargos bajo la cláusula de continuidad ("holding over")*. Adujeron que violaba la facultad constitucional del Senado sobre consejo y consentimiento y, por ende, la doctrina de separación de poderes. Pidieron se le ordenara que procediese a renominarlos o sustituirlos. Enmarcado así el pedido, en su contestación el Gobernador invocó, entre otras defensas, la *ausencia de parte indispensable* y consignó que a los jueces aludidos les "cobijan las cláusulas de continuidad establecidas por la Ley

de la Judicatura que *son parte del término de su nombramiento al cargo judicial"*. (Énfasis suplido.) *Exhibit* III, pág. 50.

El Tribunal Superior (Hon. Gilberto Gierbolini, Juez) dictaminó el 2 de mayo de 1990 que la práctica del Primer Ejecutivo privaba "al Senado de Puerto Rico de su poder constitucional de consejo y consentimiento". *Exhibit* I, pág. 35. Le ordenó "enviar al Senado para su consejo y consentimiento dentro de los próximos ciento veinte días, nombramientos, bien sean los actuales incumbentes o sus sustitutos, para cubrir los cargos de jueces cuyos términos han expirado". Íd., pág. 36.

El Gobernador apeló. Pendiente el recurso, se aprobó la Ley Núm. 17 de 21 de julio de 1990 (4 L.P.R.A. sec. 92(b)). En lo pertinente, ese *nuevo* estatuto "suprimi[ó] la cláusula de continuidad en el ejercicio de [los] cargos" de jueces de los Tribunales Superior, Distrito y Municipal. 1990 Leyes de Puerto Rico 83. *Ahora*, cesarían "en sus funciones a los noventa (90) días de vencerse [sus] término[s] si no ha[n] sido renominado[s] o cuando su[s] sucesor[es] tome[n] posesión de [sus] cargo[s], lo que ocurra primero". 4 L.P.R.A. sec. 92(b). A todos, de ser renominados y confirmados, "el término del nuevo nombramiento comenzará a contar desde la fecha en que se venció el término anterior". Íd. De ser rechazados por el Senado, cesarían inmediatamente en sus cargos.

Expresamente esta ley dispuso su aplicación a *todos* los jueces del Tribunal de Primera Instancia, incluso a los nominados y confirmados *antes* de su vigencia el 19 de octubre de 1990.

Ante esta nueva legislación, se concedió a las únicas partes hasta entonces involucradas —Hons. Nogueras, Hijo, Silva y Hernández Colón— que se expresaran sobre la posible academicidad de la apelación. Los primeros sostuvieron que no la tornaba académica y que la facultad senatorial no podía estar a merced y capricho del Goberna-

dor para escoger el momento oportuno de hacer los nombramientos. Por su parte, éste argumentó su academicidad y, además, que la Ley Núm. 17, *supra*, no adolecía de problema constitucional alguno en su aplicación *retroactiva, toda vez que la cláusula de continuidad no tenía rango constitucional.*

De esta cronología procesal, es evidente que a esa etapa podían emerger dos conclusiones. La *primera*, que la controversia medular entre *las partes originales comparecientes* estaba *limitada* a determinar la procedencia del *mandamus* para obligar al Gobernador a someter los nombramientos —del incumbente o sustituto— de aquellos jueces que continuaban en funciones *bajo la cláusula de continuidad.*

Según esta alternativa, en instancia ningún juez era parte indispensable. Al igual que en *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 413 (1982) la "*razón de pedir* en este caso *el envío de las nominaciones* de los funcionarios concernidos al Senado *nada requieren de éstos*, y más aún, nada puede requerirles porque ellos no tienen incumbencia en el asunto". (Énfasis suplido.)

La otra alternativa afloraba en virtud de la tesis del Gobernador que adelantaba la aplicación *retroactiva* de la Ley Núm. 17, *supra.* Ciertamente, esa contención —producto del estatuto aprobado *después* de la sentencia del foro de instancia— representaba un viraje abrupto a la doctrina jurisprudencial de los últimos cuarenta y cinco (45) años respecto a la cláusula de continuidad que como escudo protegía a los jueces con nombramientos vencidos y en funciones. En nuestro *amordazado* Voto Preliminar Disidente de 10 de septiembre de 1990 rechazamos la retroactividad de la Ley Núm. 17, *supra.*

*Transcurrieron cuatro (4) meses y la mayoría nada hizo o requirió de las partes.* Finalmente, el 16 de enero de 1991 resolvieron y dieron un paso *descomunal.* No lo hicieron en virtud de la controversia *precisa* y argumentos de las par-

tes comparecientes originales, sino *espontánea* y *sorpresivamente* adjudicaron los derechos de *jueces que habían sido nombrados antes de la Ley Núm. 17, supra.* Y ello, aun cuando esos jueces no estaban presentes ni eran partes en el pleito. Inexplicablemente, en cuanto a la controversia *real y única* entre las partes —obligación del Primer Ejecutivo de renominar o sustituir a jueces cuyos nombramientos habían vencido y continuaban en funciones bajo la cláusula de continuidad— *no hubo pronunciamiento alguno.*

De ese modo, surgió *por primera vez en apelación* —en virtud de la Ley Núm. 17, *supra,* y *su efecto retroactivo*— una controversia *distinta* que se convirtió en la única *razón de decidir* mayoritaria. Los pronunciamientos fueron vacilantes y confusos:

> ... [L]a cláusula de continuidad constituye *parte del término* del cargo del incumbente, los jueces nombrados bajo la vigencia de dicha cláusula *y con anterioridad a la vigencia de la Ley Núm. 17* tienen una legítima expectativa de que desempeñarán dicho puesto durante un término razonable luego de expirar el término para el cual fueron nombrados o hasta *que su sucesor tome posesión del cargo,* lo que ocurra primero. *Esta expectativa de continuidad está protegida por ley.* Los jueces nombrados al amparo de las disposiciones de la Ley de la Judicatura y de la Ley sobre Jueces Municipales que contenían cláusulas de continuidad sin términos específicos tienen, por lo tanto, una legítima expectativa de que permanecerán en sus cargos durante el tiempo razonable máximo permisible o hasta que sus sucesores tomen posesión de sus cargos. ... Hasta el límite constitucional que habremos de señalar más adelante, el mencionado interés propietario constituye una barrera infranqueable a la aplicación retroactiva de la Ley Núm. 17, ya que tal aplicación resultaría contraria a la cláusula constitucional que prohíbe la privación de la propiedad sin el debido proceso de ley. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. (Énfasis suplido y en el original.) *Nogueras v. Hernández Colón,* 127 D.P.R. 638, 647–648 (1991).

*Motu proprio* adjudicaron *un aspecto que nadie había explorado* ni *planteado y que era desconocido:* la *razonabi-

*lidad* del límite de una cláusula de continuidad, esto es, por cuánto tiempo podían los jueces —cuyos nombramientos habían expirado— ocupar sus cargos y continuar en funciones. Como afirman los interventores, *"[d]icho asunto no había sido sometido por las partes litigantes para decisión por este tribunal, no existía causa en torno al mismo y no estaban presentes o representadas las partes (los jueces nombrados antes de la fecha de vigencia de la Ley Núm. 17) cuyos derechos adquiridos se verían afectados por la resolución de esta controversia y quienes tendrían el interés apremiante para defender adecuadamente sus derechos".* (Énfasis suplido.) Solicitud de intervención, pág. 7.

Por último, la mayoría *increíblemente* resolvió que "[l]a indefinición en el término de duración de una incumbencia *holding over* atenta contra el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido por la Rama Ejecutiva y la Legislativa ... [y] el término de duración del período posterior a la expiración del término del incumbente (*holding over*) en virtud de la llamada cláusula continuidad no es ilimitado". *Nogueras v. Hernández Colón*, supra, págs. 651–652. Por *analogía* aplicaron el término de duración provisto para los nombramientos de *receso* dispuesto en *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983), y dictaminaron que *"se extendería hasta que su sucesor tome posesión [de su] cargo pero nunca después de finalizada la próxima sesión legislativa siguiente a dicha expiración".* (Énfasis suplido.) *Nogueras v. Hernández Colón*, supra, págs. 652–653.

Ese curso mayoritario motivó que en nuestro disentir vehementemente señaláramos que la mayoría había *distorsionado y aprisionado* la controversia en un *endeble razonamiento circular.* Les indicamos, en síntesis, que la *"indefinición" no la causaba la cláusula, sino la "inacción" del Gobernador,* a saber, *su tardanza.* Argumentamos que el defecto no estaba en la cláusula de continuidad, pues si el

Primer Ejecutivo cumplía diligentemente con su deber de renominar o sustituir, dicha cláusula cumplía satisfactoriamente sus propósitos.

Dicho de otro modo, sostuvimos que la "fiebre no estaba en la sábana, sino en el paciente". Poco después, el tiempo así lo aclaró. Con posterioridad a la decisión mayoritaria de 16 de enero, el Gobernador, Hon. Rafael Hernández Colón, ha descargado responsable y diligentemente su encomienda, renominando o sustituyendo rápidamente a los miembros de la Judicatura con términos vencidos. *El contraste con el pasado es sorprendente.* Derrota la tesis mayoritaria de que el Primer Ejecutivo no puede hacerlo con razonable diligencia. ¡Querer es poder!

Por último, en nuestro disenso enfatizamos que la decisión mayoritaria condenaba "a los miembros de la Judicatura a un estado de indefensión", los inmolaba, creaba "vacantes donde no las hay" (énfasis suprimido) y les infringía "un perjuicio directo". *Nogueras v. Hernández Colón*, supra, págs. 685 y 686.

En su disenso de 5 de febrero, el Juez Asociado Señor Rebollo López expresamente analizó y concluyó que a estos miembros de la Judicatura se les había violado el mandato constitucional del debido proceso de ley mediante un dictamen que "coarta, perjudica y atenta contra los mejores intereses y derechos de los jueces incumbentes sin que éstos hayan tenido la oportunidad de expresarse y ser oídos en su defensa". (Énfasis suprimido.) *Nogueras v. Hernández Colón*, supra, pág. 695.

## II

No es necesario mucho esfuerzo mental para comprender que los jueces interventores *eran y son parte indispensable en el discutido proceso*. Este mecanismo procesal armoniza el derecho constitucional a un debido proceso de ley en sus modalidades de oportuna y adecuada notificación,

concesión de una vista previa, derecho a ser oído y a confrontar la prueba adversa, y la oportunidad de presentar prueba y argumentos en su defensa. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. Véanse: *Ortiz v. Aut. Edificios Públicos y Junta*, 121 D.P.R. 896 (1988); *López Vives v. Policía de P.R.*, 118 D.P.R. 219, 230 (1987); *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414, 420 (1985); *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791, 795 (1973); *López v. Junta Planificación*, 80 D.P.R. 646, 670 (1958).

Esa realidad es suficiente motivo para dejar sin efecto la decisión. No hacerlo choca contra lo que es justo y equitativo, y es una afrenta a "la dignidad de los individuos afectados" —*López Vives v. Policía de P.R.*, supra, pág. 231— en detrimento de los "elevados principios y valores que reflejan nuestra vida en sociedad y el grado de civilización alcanzado". *Amy v. Adm. Deporte Hípico*, supra, pág. 420.

Evidentemente la decisión mayoritaria convirtió a los jueces de instancia en partes indispensables. Ellos eran los únicos auténticamente perjudicados —con derecho a ser oídos y a exponer sus argumentos— en relación con el significado histórico e impacto constitucional de la cláusula de continuidad. La decisión se tomó a sus espaldas y ha representado un menoscabo sustancial, real e inmediato en la extensión del término para el cual fueron nombrados.

### III

Es perfectamente claro el grado de diligencia exhibido por los magistrados interventores. En las circunstancias en que no ha mediado notificación de sentencia, por su naturaleza, la solicitud de intervención no puede regirse por el plazo provisto en la Regla 45 de nuestro Reglamento, 4 L.P.R.A. Ap. I-A. Como dijo la mayoría en *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593, 604–605 (1989), "[n]o es suficiente que el ausente haya sido informado de su oportunidad de intervenir en el pleito; *mientras no se le*

*haya hecho parte, no se le puede privar de sus derechos mediante sentencia".* (Énfasis suplido.) *NO CORRE NIN-GÚN TÉRMINO.*

No es culpa de los interventores que no hubiesen comparecido antes. *Jamás* estuvo en discusión si la cláusula de continuidad era o no limitada. ¡Cómo saberlo, si hasta ese momento la jurisprudencia era precisamente todo lo contrario! La nota irónica en este recurso es que aquellos que imparten justicia, y constantemente velan en primera instancia por el debido proceso de ley, fueron víctimas de tan flagrante violación. Lo peor del caso, inmolados por la máxima jerarquía judicial.

## IV

AUNQUE LA ACTUAL INTERVENCIÓN DE LOS JUECES ES INSOSLAYABLE, ES IMPOSPONIBLE DEJAR SIN EFECTO LA OPINIÓN MAYORITARIA.

En sus *méritos* reafirmamos que la Constitución vedó la reducción de los términos de duración de los cargos judiciales del Tribunal de Primera Instancia. Esa prohibición, en unión a la cláusula de continuidad, son los ingredientes más importantes del principio de independencia judicial. 1 Diario de Sesiones de la Convención Constituyente 453 (1951). Los debates suscitados por los delegados a la Convención Constituyente confirman una honda preocupación que poderosamente sugiere que dicha cláusula "se elevó a rango constitucional, en *intención y espíritu".*

Esta cláusula ha sido escudo histórico del ideal de independencia judicial. Está fundada en la necesidad pública de evitar un colapso temporal en el Gobierno —*González v. Corte,* 62 D.P.R. 160, 165 (1943)— pues "la ley aborrece las vacantes porque entorpecen la continuación de la administración de los asuntos públicos" —*Fernández v. Corte,* 71 D.P.R. 161, 178 (1950)— y tiende a "evitar vacantes que entorpezcan la continuidad en la administración de los

asuntos públicos. *Betancourt v. Gobernador*, 119 D.P.R. 435, 447 (1987).

La creación de vacantes judiciales automáticas que origina la *nueva* interpretación mayoritaria, a todos los niveles, "*conllevaría colocar a la Rama Judicial a merced de los poderes ejecutivo y legislativo ....* Esa teoría es contraria a un gobierno de leyes cimentado en la 'doctrina de frenos y contrapesos'. Frustraría la independencia de la Rama Judicial, concebida por los filósofos ingleses originalmente y luego por los angloamericanos, como el portaestandarte de los ciudadanos frente a los otros poderes de gobierno. La continuidad de los cuerpos y por ende sus funciones, es la norma y no la excepción". (Énfasis suplido.) *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 392, 396 (1985).

Es imposible comprender cómo la mayoría en este caso *primero* reconoció expresamente que la cláusula de continuidad formaba parte del nombramiento de cada juez y creaba un interés propietario sobre la duración de su nombramiento; *después* resolvió que la Ley Núm. 17, *supra*, "no puede tener efecto retroactivo a los jueces incumbentes que fueron nombrados bajo la vigencia de las cláusulas de continuidad", pues su "aplicación resultaría contraria a la cláusula constitucional que prohíbe la privación de la propiedad sin el debido proceso de ley" (*Nogueras v. Hernández Colón*, supra, pág. 648), para al *final* decir y hacer todo lo contrario: *reducirla a un período fijo, con un término máximo al cierre de toda sesión legislativa.*

Como sostienen los jueces interventores:

Resulta extraño que aquello que el texto claro de la Constitución prohíbe se haga respecto a términos judiciales se pueda hacer mediante la interpretación de la propia Ley de la Judicatura. Con todo el respeto que nos merece este Honorable Tribunal, no podemos dejar de señalar que *existe una manifiesta y enorme contradicción lógica entre los fundamentos de la opinión* del Alto Foro en este caso y *el resultado* al que finalmente se arriba mediante opinión. (Énfasis suplido.) Solicitud de intervención, pág. 17.

## V

Recapitulando; desde sus inicios en instancia, sin dificultad alguna, la pesquisa judicial se perfiló solamente como una pugna entre dos (2) miembros de la Cámara alta y el Primer Ejecutivo en cuanto a su obligación de *prontamente* renominar o sustituir jueces en funciones cobijados por la cláusula de continuidad.

El dictamen del tribunal de instancia se fundó en la tardanza irrazonable del Gobernador. No obstante ese íntimo engarce, la mayoría dejó de enjuiciar el proceder ejecutivo. *Lo esquivaron. Motu proprio* tacharon de irrazonable la operación de la cláusula de continuidad. EL INVENTARIO FINAL ES UN PODER JUDICIAL CERCENADO. Y este perjuicio se hizo sin incluir como partes ni darles oportunidad de ser oídos a los jueces del país, no obstante ser éstos forzosamente *litisconsortes* y cotitulares constitucionales del derecho adjudicado en este singular y triste drama.

El análisis que precede y las interrogantes planteadas incuestionablemente reflejan que no sólo es procedente permitir la intervención de los jueces directa e indirectamente afectados en sus cargos, sino que simultáneamente debe dejarse *sin efecto la sentencia mayoritaria.* "[A]precia[mos] como el mejor de los textos el sentido común." A. Ossorio, *El abogado: el alma de la toga,* 6ta ed., Buenos Aires, Eds. Jurídicas Europa-América, 1956. "El sentido común muchas veces es una apreciación sintética, en cánones de justicia natural, de la misma naturaleza de las cosas, de la realidad vital. *La interpretación que repugne a ese sentido común ha de ponernos en guardia contra ella. Generalmente será una mala aplicación del Derecho, probablemente una aplicación debida a un método equivocado.* Aconsejamos revisar entonces todos los razonamientos, volverlos a repetir y volver a analizar. El Derecho no puede llevar a un *resultado absurdo ni a un resul-*

*tado injusto* y debemos convencernos de que cuando nos lleva a este resultado es porque hemos seguido un camino equivocado, porque hemos errado en nuestros razonamientos." (Énfasis suplido.) J. Vallet de Goytisolo, *Panorama del Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1963, pág. 86.

LA MAYORÍA DE ESTE TRIBUNAL NO DEBIÓ DESPERDICIAR ESTA OPORTUNIDAD PARA DEJAR SIN EFECTO *DE INMEDIATO* LA ABSURDA E INJUSTA DECISIÓN QUE CONVIERTE LA INDEPENDENCIA JUDICIAL EN UN *PÉTREO* ESQUEMA LEGAL.

*FRENTE A LA OSCURIDAD, LA LUZ SIEMPRE ES BIEN RECIBIDA. LAS ACTUACIONES SON LAS QUE CUENTAN; LO DEMÁS, SON SIMPLES PALABRAS.*

— O —

Voto disidente emitido por el Juez Asociado Señor Rebollo López.

El pasado 5 de febrero de 1991 al *disentir* de la Opinión Per Curiam mayoritaria que emitiera el Tribunal en aquella ocasión *solitariamente señalamos* que la decisión mayoritaria constituía un crudo acto de "legislación judicial" que "coarta, perjudica y atenta contra los mejores intereses y derechos de los jueces incumbentes *sin que éstos hayan tenido la oportunidad de expresarse y ser oídos en su defensa*". (Énfasis en el original suprimido y énfasis suplido.) *Nogueras v. Hernández Colón*, 127 D.P.R. 638, 695 (1991).

Señalamos entonces, *en lo pertinente*, que sin que ninguna de las partes lo hubiera planteado y sin que ello fuera necesario para la solución del recurso, *la mayoría del Tribunal no sólo decretó que la* " 'cláusula de continuidad' establecida en la Ley de la Judicatura, la cual contempla la posibilidad de que un juez se mantenga en su puesto por

un período de tiempo indefinido, 'atenta contra el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido por la Rama Ejecutiva y la Legislativa'" (*Nogueras v. Hernández Colón*, supra, pág. 694), *sino que la Mayoría, en un increíble acto de legislación judicial, estableció que* "una vez vencido el término para el cual los jueces incumbentes fueron nombrados, éstos podrán continuar actuando como tales 'hasta que su sucesor tome posesión de su cargo *pero nunca después de finalizada la próxima sesión legislativa siguiente a dicha expiración'*". (Énfasis en el original.) Íd. Como se recordará, *calificamos, en aquel entonces, la actuación de la mayoría del Tribunal como la " 'Ley Número 18', aprobada por el Tribunal Supremo de Puerto Rico el día 16 de enero de 1991".* (Énfasis suplido y en el original.) Íd., pág. 695.

Basándose, no hay duda, en nuestro señalamiento a esos efectos —y los fundamentos allí expresados— un sinnúmero de jueces del Tribunal de Primera Instancia valientemente presentaron una *solicitud de intervención* en el caso *con el propósito de que se le brindara la oportunidad de demostrarle al Tribunal lo erróneo de lo decidido y de su proceder.* En el día de hoy, tan sólo el compañero Juez Asociado Señor Negrón García se hace eco de nuestra posición. *La Mayoría, sin embargo, despacha la fundamentada solicitud de los jueces de instancia con un escueto "no ha lugar".*

La Resolución mayoritaria emitida constituye *evidencia fehaciente adicional* de la corrección de las expresiones que hemos hecho en el día de hoy en la Opinión disidente que hemos emitido en *Pueblo v. Echevarría Rodríguez II*, 128 D.P.R. 752, 841 (1991). En la referida Opinión disidente expresamos, *en lo pertinente*, que:

> ... procede señalar que en el pasado, ante una situación demostrativa de que se había errado al emitirse una decisión, *este*

*Tribunal nunca vaciló en corregir su equivocación.* Evidencia *maravillosa y fehaciente* de ese *hoy añorado proceder* lo constituye la decisión que se emitiera en *Reyes Coreano v. Director Ejecutivo,* 110 D.P.R. 40 (1980). La actitud *entonces reinante* en el seno del Tribunal quedó plasmada para la posteridad en la extraordinaria terminología con que se comenzó la mencionada decisión, a saber:

"El temor de que se nos tache de inconsistentes no debe impedir que reconsideremos la opinión emitida en este caso el pasado 20 de noviembre. Persistir en el error para realzar la consistencia de lo decidido constituiría una abdicación del deber que tenemos, como tribunal apelativo, de impartir justicia y de pautar el derecho. Es por ello que abordamos nuevamente la controversia cuya solución hemos intentado en dos opiniones anteriores." ...

La referida actitud y disposición de hacer cumplida justicia —*esa fina sensibilidad*— es una hoy *ausente* del seno del Tribunal. En la actualidad, en lugar de reconsiderar y corregir el error cometido anteriormente, *se intenta explicar y justificar la injusticia cometida.* (Énfasis en el original.)

Existe, no hay duda, una diferencia entre el caso de *Echevarría Rodríguez y López Watts*, y el presente. *En este último, la Mayoría ni tan siquiera se molesta en "explicar y justificar la injusticia cometida".*