Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| José Rafael Sánchez Pagán<br><br>*Apelado*<br><br>v.<br><br>FHR ESJ OPERATIONS, LLC t/c/c Fairmont El San Juan Resort<br><br>*Apelante* | KLAN202401152 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm.: CA2022CV00352 (407)<br><br>Sobre: Despido Injustificado (Ley Núm. 80) y otros |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de julio de 2025.

Comparece ante nos FHR ESJ Operations LLC t/c/c/ Fairmont El San Juan Resort (Fairmont o el apelante) mediante recurso de *Apelación*, en el cual solicita la revisión de la *Sentencia*[1] emitida y notificada el 13 de diciembre de 2024, por el Tribunal de Primera Instancia, Sala Superior de Carolina (TPI o foro apelado). Mediante el referido dictamen, el foro apelado declaró *Ha Lugar* la *Querella*[2] laboral presentada por el señor José Rafael Sánchez Pagán (señor Sánchez o apelado) sobre despido injustificado y discrimen por su origen nacional.

Por los fundamentos que expondremos a continuación, se **modifica** la *Sentencia* apelada y, así modificada, se **confirma**.

**I.**

El 10 de febrero de 2022, el señor Sánchez presentó una *Querella* en contra de Fairmont en la cual reclamó que se le despidió

---

[1] Apéndice del recurso de *Apelación*, págs. 1-27.
[2] Apéndice del recurso de *Apelación*, págs. 425-426.

Número Identificador

SEN2025_____

de su empleo de manera discriminatoria[3] y sin justificación. El apelado alegó que trabajó para Fairmont desde el 31 de mayo de 2000 hasta el 10 de febrero de 2021. Como consecuencia de su despido, solicitó: (1) una mesada de doscientos dieciocho mil novecientos ochenta y cinco dólares con ochenta y cuatro centavos ($218,985.84) conforme a la Ley Núm. 80 de 30 de mayo de 1976[4]; (2) los daños y angustias mentales sufridos a causa del despido ascendiente a cien mil dólares ($100,000.00); (3) los honorarios de abogado más las costas y gastos del procedimiento.

Asimismo, el 25 de abril de 2022, Fairmont presentó su *Contestación a Querella*[5] en la cual negó que el despido del señor Sánchez fuera de manera injustificada. Específicamente, informó que se le despidió por una infracción al "Non-Disclosure Agreement"[6] al revelar información confidencial sobre un cliente VIP del hotel. Además, alegó que el apelado comenzó a trabajar para Fairmont desde el 3 de enero de 2020, no desde el 31 de mayo de 2000 como alegó el señor Sánchez.

Posteriormente, el 20 de abril de 2023, Fairmont sometió una *Solicitud de Sentencia Sumaria Parcial*[7] en la cual sostuvo que el señor Sánchez no pudo establecer un caso *prima facie* de discrimen. Asimismo, adujo que no era de aplicación la figura de patrono sucesor o de traspaso de negocio en marcha. Como fundamento, solicitó que se tomara conocimiento de la determinación del Tribunal de Apelaciones en el caso KLAN202100197[8], en el que se determinó que ambas figuras no operaban en estas circunstancias, porque Fairmont realizó un acuerdo de administración y no una

---

[3] Cabe destacar que, en la vista en su fondo celebrada el 21 de agosto de 2024 y, previo al desfile de la prueba, el señor Sánchez desistió de la causa de acción de discrimen por origen nacional.
[4] 29 LPRA sec. 185 *et. seq.*
[5] Apéndice del recurso de *Apelación*, págs. 425-426.
[6] Apéndice del recurso de *Apelación*, págs. 174-181.
[7] Apéndice del recurso de *Apelación*, págs. 268-418.
[8] Martin Smith v. FHR ESJ Operations, LLC. KLAN202100197 (15 de julio de 2021).

compra de activos y/o pasivos. Es por ello que, como consecuencia, no se debía considerar el tiempo que el señor Sánchez trabajó para otras compañías que administraban el hotel. Así las cosas, solicitó que se desestimara la causa de acción por discrimen y que, de existir un derecho a la mesada, determinara que la misma se debe computar desde el 3 de enero de 2020, fecha en que el apelado comenzó a trabajar bajo Fairmont.

Por otro lado, el 5 de junio de 2023, el señor Sánchez presentó una *Oposición a Moción de Sentencia Sumaria*[9] en la cual solicitó que se declarara *No Ha Lugar* la *Moción de Sentencia Sumaria.* Reiteró que el cálculo de la mesada debía comenzar desde el 31 de mayo de 2000. Arguyó que, en el caso de marras, Fairmont no presentó prueba que estableciera que no le aplican las mencionadas doctrinas y, destacó que su contrato no tenía fecha de caducidad, lo cual es distinto a los hechos en controversia en el caso previamente mencionado. Señaló además que, al surgir interrogantes sobre el nuevo contrato, este se acercó al personal de Recursos Humanos para aclarar las prerrogativas sobre cómo se podía afectar su puesto, salario, beneficios y antigüedad. Sobre la causa de acción por discrimen, el señor Sánchez argumentó que, en su deposición, surgieron los eventos en los que ocurrieron situaciones incómodas con relación a su origen puertorriqueño.

Así las cosas, el 21 de julio de 2023, el TPI emitió una *Resolución*[10] en la cual concluyó que aún existían hechos materiales en controversia que envolvían elementos subjetivos de intención, de negligencia y de credibilidad. Por lo que determinó que no se encontraba en posición de disponer del caso mediante la vía sumaria.

---

[9] Apéndice del recurso de *Apelación,* págs. 240-267.
[10] Apéndice del recurso de *Apelación,* págs. 226-239.

Luego de varios trámites procesales, el TPI, mediante *Sentencia*[11] del 13 de diciembre de 2024, emitió las siguientes determinaciones de hechos probados:

1. El querellante, José Rafael Sánchez Pagán, trabaja como director de área de cuentas locales e internacionales en grupos para la cadena de hoteles Wyndham Grand Río Mar y Wyndham Palmas desde el 2022.

2. El querellante cuenta con 35 años de experiencia profesional en la industria hotelera. Trabajó en seis propiedades distintas, tales como Hyatt Dorado Beach, Hyatt Cerromar y el Hotel San Juan. En este último trabajó por 20 años y durante ese tiempo, laboró 8 años para el Caribe Hilton, el Conrad Condado Plaza y el Hotel San Juan simultáneamente.

3. En relación con el Hotel San Juan, el querellante comenzó ocupando el puesto de "senior sales and marketing manager" (desde el 31 de mayo de 2000 al 2016-2017). Posteriormente, el querellante fue promovido a director asociado de ventas y mercadeo (hasta el 2019); y luego tuvo un descenso al puesto de director de cuenta corporativa. En el 2020, ocupó la posición de director de mercado local en grupos para Fairmont.

4. En los 20 años que trabajó para el Hotel San Juan no recibió medidas disciplinarias, ni fue amonestado ni suspendido de empleo y sueldo.

5. El querellante considera su ejecutoria trabajando para el Hotel San Juan como excelente. Este se consideró un "embajador de servicio para el hotel".

6. En el 2019, el personal de la división de recursos humanos informó a través de una asamblea que Fairmont tomaría la administración del Hotel San Juan.

7. Como parte de la transición a la nueva administración del Hotel San Juan, el 27 de diciembre de 2019, a la 1:17 p.m., la Sra. Jacqueline Pietri remitió un correo electrónico de convocatoria a la dirección electrónica esj_leaders@elsanjuanhotel.com con copia a la dirección electrónica esj_human_resources@elsanjuanhotel.com para la coordinación de dos sesiones calendarizadas para los días 3 y 4 de enero de 2020 con el propósito de que los empleados del hotel firmaran y completaran la nueva documentación requerida por Fairmont. Se adjuntó al correo electrónico varios documentos, entre ellos, el contrato de empleo. Exhíbit 12 Parte Querellada

8. El querellante recibió el mencionado correo electrónico como parte del grupo "leaders".

9. El 27 de diciembre de 2019, a las 4:42 p.m., el querellante replicó al antes mencionado correo electrónico, el mensaje siguiente: "Jaaaaaaaaac: Pregunta seria; Esto parece un re-hire? Mantendremos el seniority en caso de un Lay Off? Nos honran los años de servicio? Solo preguntas que yo sé muchos gerenciales y supervisores tendrán. Espero tus sabios comentarios. [...]" Exhíbit 1 Parte querellante. El propósito de dicho mensaje fue aclarar las dudas del querellante, sobre los años de antigüedad, y si les honrarían los años de servicio desde que originalmente fueron contratados, entre otras interrogantes.

10. A las 4:43 p.m. del mismo día, la Sra. Jacqueline Pietri, le contestó al querellante lo siguiente: "La fecha de hire se mantiene ...". Exhíbit 2 Parte Querellante. La Sra. Pietri admitió que cuando expresó la fecha de hire, en su contestación, se refería al 31 de mayo de 2000. Sin embargo,

---

[11]Apéndice del recurso de *Apelación*, págs. 1-27.

a pesar de que contestó que la "fecha de hire se mantiene", la Sra. Pietri testificó que no tenía información sobre qué pasaría con el seniority en caso de lay off y si se honrarían los años de servicio. La Sra. Pietri aceptó que su contestación podía ser malinterpretada por el empleado; específicamente, en cuanto al cómputo de la mesada que podría tener derecho el empleado en caso de un despido injustificado.

11. A las 4:47 p.m. del mismo día, el querellante replicó "[y] eso qué significa en caso de una eliminación de plaza? Te pagan tu severance basado en la fecha original de habeL sido "jaield" en el Hotel o a partir de que firmaste con Failmon?" Exhíbit 2 Parte Querellante.

12. Este último correo electrónico no fue contestado por escrito por la Sra. Pietri. Sin embargo, el querellante testificó que la Sra. Pietri le mencionó que no se preocupara y que eso se aclararía en la charla de firma del contrato. En dicha charla, en la cual intervinieron la Sra. Angie Nieves (Gerente de beneficios de recursos humanos), la Sra. Kerania Olmo (Directora de recursos humanos) y la Sra. Jacqueline Pietri, se reiteró que "nada cambiaría". En la reunión también estuvo personal afiliado a FHR ESJ Operations, LLC, quienes estuvieron a cargo de dirigir esa reunión y las presentaciones.

13. Según el testimonio del querellante, en la reunión se aclaró que la fecha de contratación original se mantenía, que los beneficios, acumulaciones, planes médicos y salarios se quedarían igual, y que era simplemente un proceso transitorio interno de la compañía que comenzaría a operar el Hotel San Juan. Con esas aclaraciones, el querellante decidió firmar la oferta de contrato empleo el 3 de enero de 2020 con Accor, (compañía sombrilla dueña de marcas de hoteles, entre ellas, Fairmont).

14. Al momento de los mensajes reseñados, la Sra. Jacqueline Pietri ocupaba la posición de asistente de la directora del departamento de recursos humanos para ESJ Resort. Ella era la segunda en mando dentro del departamento de recursos humanos. En ese momento, ESJ Resort operaba el Hotel San Juan.

15. Previo a los mensajes enviados, la Sra. Jacqueline Pietri ya había sostenido reuniones con personal de FHR ESJ Operations, LLC.

16. El 3 de enero de 2020, la entidad FHR ESJ Operations, LLC comenzó a operar la administración del Hotel San Juan. Sin embargo, antes de esa fecha, había personal corporativo de dicha entidad dentro del hotel para sostener reuniones.

17. El 3 de enero de 2020, el querellante recibió varios documentos, entre ellos, el Código de Ética y Responsabilidad Corporativa y el Manual de Empleado fechado a 3 de enero de 2019.

18. En la cláusula 1.2 del contrato de empleo se dispone: "Your original hire date of 5/31/2000 with El San Juan Hotel will continue to be recognized soley for the purposes of determining your period of services with the Company". Exhíbit 3 Parte Querellada.

19. En el primer párrafo del contrato de empleo se establece, entre otras cosas, lo siguiente: "Your position will be Director, Business Travel, Fairmont El San Juan Hotel effective January 3, 2020 (the "Hire Date") although the Company reserves the right to amend your title to accurately reflect your current duties and responsibilities." Exhíbit 3 Parte Querellada.

20. En la cláusula 7.1 el contrato de empleo se dispone: "The employment with the Company does not have a specific term of duration". Exhíbit 3 Parte Querellada.

21. Durante la pandemia de Covid-19 en el 2020, el querellante fue separado temporalmente de su trabajo, pero

recibía los beneficios de su posición. Sin embargo, como ejecutivo de ventas, durante ese tiempo, ayudó al hotel a firmar un contrato con Jet Blue, lo que fue reconocido por el hotel.

22. El querellante califica su ejecutoria como excelente en el Hotel San Juan durante el año 2020.

23. El 2 de febrero de 2021 fue notificado de la suspensión de su empleo en una reunión en la que intervino la Sra. Kerania Olmo y la Sra. Jacqueline Pietri. En esa reunión se le increpó al querellante si había compartido información con alguien fuera del hotel respecto a un cliente de grupo VIP. Al respecto, se le mencionó sobre "Stephanie Del Valle", quien representaba el grupo de Miss Mundo. El querellante testificó que Stephanie del Valle le fue referida por la gerencia del hotel, que él realizó la cualificación de la cuenta, que le hizo una propuesta formal, y le dio seguimiento por varias semanas.

24. El querellante mencionó que la Sra. Stephanie Del Valle estaba requiriendo habitaciones y consumo gratuito; y que ello fue consultado con sus superiores. Luego de realizar la consulta, el querellante le realizó una oferta al grupo de Miss Mundo; sin embargo, posteriormente, a principios de diciembre de 2020, del grupo de Miss Mundo se le informó al querellante que ya no estaban considerando a Fairmont sino otros hoteles alrededor de la isla.

25. En la reunión se le informó al querellante que Stephanie del Valle se quejó con "Andro Nodarse León", (dueño del hotel), pero no se le explicó en qué consistió la queja. Se le indicó que estaba suspendido sin paga y que se comenzaría una investigación.

26. Como parte de su contrainterrogatorio, el querellante indicó que en la reunión no se le habló de la Sra. Margarita Casablanca ni del Hotel Hyatt Regency Coco Beach.

27. Durante el periodo de suspensión de su empleo, el querellante pensó que la Sra. Stephanie Del Valle pudo haber mentido en su contra, ya que, según él, esta había querido sacar ventaja del hotel con cosas gratis. Y, además, porque luego el querellante se enteró de unas alegaciones sobre fraude, engaño y falta de pago atribuidas a esa persona, las cuales fueron reseñadas por los medios.

28. El 9 de febrero de 2021, la Sra. Kerania Olmo le comunicó al querellante que fuera al otro día al hotel. El 10 de febrero de 2021, la Sra. Kerania Olmo le informó ("descompensada" y "llorando") al querellante que estaba despedido de su puesto.

29. Al querellante no le notificaron copia de la investigación, no le notificaron el resultado de la investigación ni las personas que formaron parte de esta.

30. El querellante cuestionó la razón de su despido, y le replicaron que no tenían que decirle. Al querellante no le entregaron carta de despido.

31. El querellante no formó parte de la investigación que se realizó en su contra.

32. El querellante no fue objeto de amonestación ni de medida disciplinaria, previo a su despido el 11 de febrero de 2021.

33. El querellante entiende como información confidencial y/privilegiada aquella data que recibe como empleado y que no debe ser divulgada a una tercera persona. El querellante testificó que nunca divulgó información confidencial y/o privilegiada del Hotel San Juan.

34. La Sra. Kerania Olmo trabaja en calidad de directora de talento y cultura para FHR ESJ desde el 3 de enero de 2020. Trabaja asuntos de reclutamiento, adiestramiento, entre otras áreas.

35. El querellante fue despedido el 11 de febrero de 2021.

36. La Sra. Jacqueline Pietri no estuvo involucrada en la determinación de despedir al querellante ni fue entrevistada como parte de la investigación que se realizó contra el querellante.

37. La Sra. Jacqueline Pietri no formó parte de la investigación que realizó el departamento de recursos humanos de la queja presentada y no tuvo conocimiento de la queja contra el querellante sino cuando intervino luego en el "proceso de los documentos y el récord".

38. La Sra. Kerania Olmo le cuestionó al querellante si él había divulgado información de un cliente a la competencia o si había realizado comentarios a una tercera persona sobre el grupo de Miss Mundo. Según la Sra. Kerania Olmo, el querellante le admitió haber compartido información a la Sra. Margarita Casablanca, una representante del hotel Hyatt Regency Grand en Río Grande, sobre que el grupo de Miss Mundo no iba ser atendido por Fairmont porque dicho grupo quería todo gratis.

39. La Sra. Kerania Olmo no recogió por escrito lo expresado por el querellante ni realizó un informe o narrativo escrito de la investigación de la queja.

40. La Sra. Kerania Olmo no realizó las entrevistas de la investigación, pero entiende que al parecer se entrevistaron a tres personas y que solo una persona consignó su declaración por escrito. La Sra. Kerania Olmo no pudo especificar quiénes fueron esas personas entrevistadas.

41. La Sra. Kerania Olmo tomó únicamente unas notas sobre su investigación.

42. La gerencia del hotel Fairmont tomó la decisión de despedir al querellante.

43. La Sra. Kerania Olmo declaró que el despido del querellante se debió a una violación a la política de confidencialidad según el Manual del Empleado.

44. Respecto al asunto de confidencialidad, el contrato de empleo firmado por el querellante dispone, en la cláusula 4, lo siguiente: "4.1 During your employment with the Company, you will be entrusted with, disclosed, or have access to "Confidential Information" (as defined in Section 9). Therefore, you agree that during and after your period of employment you will follow: 4.1.1 Hold in strict confidence de Confidential Information and not disclose or divulge the Confidential Information to any person or entity outside of the "Accor" (as defined in Section 9), including through any failure to exercise due care and diligence; 4.1.2. Only share such information in accordance with corporate policies and/or as instructed by your manager; 4.1.3. Not use this Confidential Information (including but not limited to knowledge, contacts and connections) for your personal benefit or the benefits of any person or entity other than the "Accor"; and 4.1.4. Use your best endeavours to prevent publication or disclosure of any Confidential Information. You will inform the Company immediately upon becoming aware, or suspecting that any such person, company or organization knows or has used any Confidential Information. The covenants in this Section 4.1 will only cease to apply to any information which becomes available to the public generally, otherwise than though your fault." Exhíbit 3 Parte Querellada.

45. La cláusula 9 del contrato de empleo define, entre otros, los términos siguientes: "Confidential Information means any information concerning the business of the Hotels Group which is not generally known to the public, including without limitation, any trade secrets, lists of Customers or Suppliers, details or contracts with or requirements of Customers or Suppliers, the identity of any owner of an Hotels Group hotel or property, information relating to any current, past or

prospective management agreement or joint venture, information pertaining to business methods, sales plans, design plans and strategies, management organization, computer system and software, operating policies or manuals, personnel records or information, information relating to current past or contemplated employee benefits or compensation data or strategies, business, financial, development, residential or marketing data, strategies or plans, or manpower strategies or plans, financial records or other financial, commercial, business or technical information relating to the Hotels Group. For clarity, Confidential Information shall not include information that has been previously disclosed to the public by the Hotels Group or is in the public domain (other than by reason of your breach of this letter). Customer means any person or entity to whom the Company or any Hotels Group company provided Restricted Service during the Relevant Period and with which, during that period either you, or any employee under your direct supervision had materials dealings in the course of employment with the Company or any Hotels Group company. For the avoidance of doubt, this would include hotel and property owners, joint venture partners, guest, corporate account holders and conference customers. Prospective Customer means any person or entity with whom the Company had discussions or negotiations or was invited to tender or propose to during the Relevant Period regarding the possible distribution, sale or supply or Restricted Service and with whom during such period you, or any employed who was under your direct supervision, had material dealings with, or access to Confidential Information is respect of, in the course of employment with the Company or any Hotels Group company." Exhíbit 3 Parte Querellada.

46. La sección 5.15 del Manual del Empleado Puerto Rico regula lo relacionado a la información privada protegible y confidencial. Exhíbit 1 Parte Querellada. En esta se dispone lo siguiente: "De acuerdo con la Carta de Ética y Responsabilidad Social Corporativa, los empleados no utilizarán para su propio beneficio financiero, ni divulgarán para el uso de otros, información privada protegible y confidencial obtenida como resultado de su empleo en un hotel Accor. "Información confidencial" se refiere a un pedazo de información, o una recopilación de información, en cualquier forma (en papel, en un archivo electrónico o de otra manera), relacionada con el negocio de la Compañía que la Compañía no ha hecho pública o no ha autorizada a hacerse pública y, que generalmente no es conocida por el público a través de los medios adecuados. Cierta información y material perteneciente al Hotel, Fairmont o Accor, incluyendo, pero no limitado a, sus expedientes comerciales privados protegibles, expedientes con respecto a los Huéspedes, estrategias de mercado, procesos informativos, programas y códigos, dispositivos, procesos, planes y los métodos son confidenciales privados protegibles y equivalen a secretos comerciales. …"

47. La Sra. Kerania Olmo declaró que se le entregó al querellante un acuerdo de separación ofreciéndole una cantidad monetaria y una extensión de su cubierta de plan médico.

48. El expediente de personal del querellante solo contiene documentos e información desde el 3 de enero de 2020. 49. La Sra. Kerania Olmo desconoce quién, si alguien, tiene el expediente de personal del querellante y de todos los demás empleados del hotel, previo a la entrada de Fairmont.

El TPI condenó a Fairmont a pagar la cantidad de ciento noventa y nueve mil ochocientos diecisiete dólares con cinco centavos ($199,817.05) por concepto de mesada, calculado desde el 31 de mayo de 2000. Además de suplir el veinticinco por ciento (25%) en concepto de honorarios de abogados. El TPI determinó que no era de aplicación la figura del patrono sucesor, puesto que no existía una actuación ilegal que se le imputara al patrono anterior. De igual manera, determinó que no aplicaba la doctrina de negocio en marcha porque, a pesar de la continuidad de las operaciones, no se presentó evidencia sobre la compra de los activos y/o los pasivos del hotel. Además, concluyó que se despidió injustificadamente al señor Sánchez al amparo de la Ley Núm. 80, *supra.* Esto, debido a que el foro apelado estableció que Fairmont no evidenció que la alegada infracción del señor Sánchez haya sido tan grave que ameritara su despido en la primera falta.

Inconforme, Fairmont presentó el recurso de *Apelación* que nos ocupa, en el que planteó los siguientes señalamientos de error:

**PRIMER SEÑALAMIENTO DE ERROR**
ERRÓ EL TPI COMO CUESTIÓN DE DERECHO AL DECLARAR CON LUGAR LA QUERELLA Y DETERMINAR QUE EL DESPIDO FUE INJUSTIFICADO.

**SEGUNDO SEÑALAMIENTO DE ERROR**
ERRÓ EL TPI EN SUS DETERMINACIONES DE HECHOS, APRECIACIÓN DE LA PRUEBA TESTIFICAL Y DOCUMENTAL AL INCURRIR EN ERROR MANIFIESTO.

**TERCER SEÑALAMIENTO DE ERROR**
ANTE UNA DETERMINACIÓN DE DESPIDO INJUSTIFICADO, ERRÓ EL TPI AL ADJUDICAR LA MESADA DE $199,817.05 Y NO LA $32,528.36.

**CUARTO SEÑALAMIENTO DE ERROR**
ANTE UNA DETERMINACIÓN DE DESPIDO INJUSTIFICADO, ERRÓ EL TPI AL AUMENTAR LOS HONORARIOS DE ABOGADOS Y NO FIJARLOS AL 15%.

Luego de varios trámites procesales referentes a la transcripción de la prueba oral, el señor Sánchez presentó su *Alegato Suplementario* el 21 de abril de 2025. Por su parte, el apelado compareció el 28 de mayo de 2025 mediante *Alegato en Oposición a Apelación.*

Con el beneficio de la transcripción de la prueba oral y la comparecencia de ambas partes, procedemos a discutir la norma jurídica aplicable al caso.

**II.**

**-A-**

Es norma reiterada que las determinaciones de hechos y la adjudicación de credibilidad que hace un foro de instancia son merecedoras de gran deferencia por parte de los tribunales apelativos debido a la oportunidad que tiene el juzgador de hecho en dicho foro de observar y escuchar a los testigos[12]. Así pues, un tribunal apelativo no debe intervenir con las referidas determinaciones de hechos ni con la adjudicación de credibilidad que haya hecho el Tribunal de Primera Instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto[13]. Solo ante la presencia de estos elementos o cuando la apreciación de la prueba no concuerde con la realidad fáctica es que un foro apelativo debe intervenir con la apreciación efectuada[14].

Ahora bien, nuestro Tribunal Supremo ha expresado que "[a]unque el arbitrio del juzgador de hechos es respetable, y merece deferencia, no es absoluto"[15]. Por eso, la apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo[16]. Cuando del examen de la prueba se desprende que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios improbables o imposibles, el Tribunal Supremo ha justificado la

---

[12] *ELA v. SLG Negrón-Rodríguez*, 184 DPR 464, 486 (2012); *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67 (2009).

[13] *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490 (2016), *Serrano Muñiz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007); *In re Ruiz Rivera*, 168 DPR 246 (2006); *Álvarez v. Rivera*, 165 DPR 1, 25 (2005); *López Delgado v. Cañizares*, 163 DPR 119 (2004); *Hernández v. San Lorenzo Const.*, 153 DPR 405, 424-425 (2001).

[14] *Pueblo de P.R. v. Collazo*, 176 DPR 133 (2009); *Pueblo de P.R. v. Liliana Irizarry Irizarry*, 156 DPR 780 (2002); *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

[15] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013), *Méndez v. Morales*, 142 DPR 26 (1996).

[16] *Íd.*

intervención del tribunal apelativo con la apreciación de la prueba realizada por el tribunal sentenciador[17]. El Tribunal Supremo reiteró estos principios y expresó que "el nivel de pasión, prejuicio o parcialidad que hace falta demostrar para impugnar exitosamente las determinaciones del foro primario sobre los hechos varía de caso a caso"[18]. Ante una alegación de este tipo, los foros apelativos debemos evaluar si el juzgador cumplió su función judicial de adjudicar la controversia específicamente conforme a derecho y de manera imparcial, pues solo así podremos descansar con seguridad en sus determinaciones de hechos[19].

En fin, como foro apelativo podemos intervenir únicamente con la apreciación de la prueba oral que haga el foro recurrido cuando este actúe con pasión, prejuicio, parcialidad, o cuando cometa un error manifiesto. Si no se demuestra que la sentencia fue dictada en esas circunstancias, tales determinaciones deben respetarse en la etapa de apelación.

**-B-**

En reiteradas ocasiones nuestro más alto foro ha enfatizado la importancia del derecho a un empleo[20]. La Ley Núm. 80 es indudablemente, una legislación reparadora y como tal, estamos obligados a interpretarla liberalmente a favor de los derechos del trabajador[21]. La referida ley regula las acciones relacionadas con el despido justificado de un empleado[22].

Con referencia a las personas cubiertas por las garantías de la Ley Núm. 80[23], resulta de aplicación a los empleados de comercio,

---

[17] *C. Brewer P.R., Inc. v. Rodríguez,* 100 DPR 826, 830 (1972).
[18] *Dávila Nieves v. Meléndez Marín, supra*, págs. 775-776.
[19] *Íd.*, pág. 777.
[20] *Amy v. Adm. Deporte Hípico*, 116 DPR 414, 421 (1985).
[21] *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 906 (2011).
[22] *Íd.*, pág. 905.
[23] La Ley de Transformación y Flexibilidad Laboral, Ley Núm. 4-2017, con vigencia inmediata, enmendó varios artículos de la Ley Núm. 80, *supra.* No obstante, la Ley Núm. 4-2017 dispone en su Art. 1.2 que su aplicación será prospectiva: "[l]os empleados contratados con anterioridad a la vigencia de esta Ley, continuarán disfrutando los mismos derechos y beneficios que tenían previamente, según lo dispuesto expresamente en los Artículos de [e]sta".

industria o cualquier otro negocio o sitio de empleo que: (1) estén contratados sin tiempo determinado; (2) reciban una remuneración, y (3) sean despedidos de su cargo sin haber mediado justa causa[24]. El Artículo 1 de la *Ley Núm. 80*[25], establece que todo empleado que haya sido despedido de manera injustificada tendrá derecho a recibir de su patrono una indemnización. Una vez identificado dentro del grupo de empleados cubiertos por la Ley Núm. 80, esta crea una presunción de que todo despido es injustificado y que le corresponde al patrono, mediante preponderancia de la prueba, demostrar lo contrario; es decir, que hubo justa causa[26].

A tenor con lo anterior y aun cuando se presume que todo despido es injustificado, "[e]n Puerto Rico no existe una prohibición absoluta contra el despido de un empleado. Si existe justa causa, éste puede ser despedido"[27]. El Artículo 2 de la Ley Núm. 80[28], establece unos supuestos que constituyen justa causa para el despido:

> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.
> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce

---

[24] *Rivera Figueroa v. The Fuller Brush, Co.*, 180 DPR 894, 906 (2011).
[25] 29 LPRA sec. 185a.
[26] Véase *Rivera v. Pan Pepín*, 161 DPR 681, 670 (2004); *Arce v. Martínez*, 146 DPR 215, 230-231 (1998); *Báez García v. Cooper Labs., Inc.*, 120 DPR 145, 152 (1987).
[27] *Santiago v. Kodak Caribbean, Ltd.*, 129 DPR 763, 775 (1992).
[28] 29 LPRA sec. 185b.

o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.

Ahora bien, la Ley Núm. 80 no pretende ser un código de conducta limitada a una lista de faltas claramente definidas con sus sanciones correspondientes[29]. Según surge de la lista que precede, las causales establecidas en la Ley Núm. 80 van dirigidas a proveer la justa causa en el empleo, algunas se centran sobre el desempeño del empleado, mientras que otras están relacionadas con los aspectos económicos vinculados a la administración de una empresa[30].

Así, pues, si alega que existió justa causa para el despido de un empleado, el patrono tendrá el peso de la prueba para establecerlo, y el criterio será el de preponderancia de la prueba[31]. Por lo tanto, en estos casos el patrono debe alegar, en su contestación a la demanda o querella, los hechos que dieron origen al despido y a probar que el mismo estuvo justificado, para quedar exento de pagar la indemnización dispuesta en la Ley Núm. 80[32]. Esta norma "tiene como fundamento que el patrono demandado, por su posición más ventajosa, generalmente tiene mayor acceso a la evidencia del despido"[33]. Si el patrono revierte la presunción, el empleado tiene que presentar prueba de refutación para establecer que el despido fue injustificado, pero en esta ocasión no tendrá el beneficio de la referida presunción[34]. Si resultara que el empleado fue despedido injustificadamente, el remedio de este será una compensación, también conocida como la mesada, la cual se otorga

---

[29] *Rivera v. Pan Pepín*, 161 DPR 681, 689 (2004).
[30] *Romero et al. v. Cabrer Roig et al.*, 191 DPR 643, 651-652 (2014).
[31] *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 906-907 (2011).
[32] *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 379 (2001).
[33] *Ibáñez v. Molinos de P.R., Inc.*, 114 DPR 42, 49 (1983).
[34] *Arce v. Martínez*, 146 DPR 215, 232 (1998).

acorde a la duración del empleo, al sueldo devengado y la cantidad que hubiera percibido[35].

La Ley Núm. 80, *supra,* no favorece el despido como sanción a la primera falta salvo "si por su gravedad y su potencial de agravio pone en riesgo el orden, la seguridad o la eficiencia que constituyen el funcionamiento normal del establecimiento"[36]. La intención del legislador es validar el despido cuando media un patrón o violación reiterada a las normas de la empresa[37].

El Tribunal Supremo determinó que el análisis para justificar esta medida es que "[l]a falta o acto aislado que dé lugar a[l] despido del empleado en primera ofensa ha de ser de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría imprudencia esperar su reiteración para separarlo del establecimiento"[38].

**-C-**

La doctrina jurisprudencial del patrono sucesor aplica ante una venta o transferencia de activos, o ante la reorganización de un negocio, si la operación y la identidad de la empresa anterior es sustancialmente similar al negocio luego del cambio[39]. Esta figura persigue imponer responsabilidad al nuevo adquirente de una empresa por despidos injustificados realizados por el patrono predecesor[40]. Cabe señalar que, al identificar si aplica la doctrina de patrono sucesor, nuestro más Alto Foro determino los criterios a considerar:

(1) La existencia de una continuación sustancial de la misma actividad de negocios;
(2) La utilización de la misma planta o instalación para las operaciones;

---

[35] 29 LPRA sec. 185a; *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 375 (2001).
[36] *Delgado Zayas v. Hosp. Int. Med. Avanzada,* 137 DPR 643, 649 (1994).
[37] *Srio. Del Trabaja v. G.P. Inds., Inc.*, 153 DPR 223, 244 (2001).
[38] *Secretario del Trabajo v. I. T. T.*, 108 DPR 536, 544 (1979).
[39] *Segarra Rivera v. International Shipping Agency, Inc.*, 208 DPR 964, 991 (2022).
[40] *Adventist Health v. Mercado,* 171 DPR 255 (2007).

(3) El empleo de la misma, o sustancialmente la misma, fuerza obrera;

(4) La conservación del mismo personal de supervisión;

(5) La utilización del mismo equipo y maquinaria, y el empleo de los mismos métodos de producción;

(6) La producción de los mismos productos y la prestación de los mismos servicios;

(7) La retención del mismo nombre, y

(8) La operación del negocio durante el período de transición. No obstante, ninguno de esos criterios es de por sí solo determinante[41].

Por otro lado, el Departamento del Trabajo y Recursos Humanos (DTRH) publicó las *Guías para la interpretación de la Legislación Laboral de Puerto Rico* de 8 de mayo de 2019 (Guías para la interpretación de la Legislación Laboral)[42] y dispuso en su Sección 9.8: sobre el patrono sucesor lo siguiente:

> La doctrina del patrono sucesor se incorporó jurisprudencialmente a nuestro ordenamiento jurídico, procedente del derecho común estadounidense, para atender situaciones en las que una operación comercial cambia de dueño y se requiere determinar los derechos de los empleados frente al nuevo patrono. Ahora bien, es necesario enfatizar que el único propósito de la referida doctrina es hacer responsable al nuevo patrono por las obligaciones laborales o actos ilegales del patrono anterior. En ese sentido, **antes de considerar la aplicación de la doctrina, el juzgador "debe [] primero identificar la existencia de una obligación laboral o un acto ilegal imputable al patrono anterior.** Una vez establecido lo anterior, podrá pasar a examinar si aplica la Doctrina de Patrono Sucesor. Nunca antes"[43]. (Énfasis nuestro).

El primer análisis que se debe hacer para responsabilizar al nuevo patrono es establecer que el despido realizado por el patrono anterior no fue justificado[44]. Por ende, de no existir un despido bajo el patrono anterior, no será de aplicación esta doctrina.

Por otro lado, la Ley Núm. 80 define el traspaso de un negocio en marcha como:

> [A]quella compraventa de una empresa o negocio, mediante la cual un patrono vende a otro patrono una parte sustancial de los activos y/o pasivos del negocio, sin interrupción o cese en las operaciones del mismo por más de seis (6) meses y se continúa operando el mismo tipo de negocio en el mismo

---

[41] *Íd.*

[42] Departamento del Trabajo y Recursos Humanos, Guías para la Interpretación de la Legislación Laboral de Puerto Rico, 1ª ed., 8 de mayo de 2019, en https://www.trabajo.pr.gov/docs/Boletines/_Legislacion_Laboral.pdf.

[43] *Íd.*, pág. 150, citando a *Roldán Flores v. M. Cuebas, Inc.,* 199 DPR 664, (2018).

[44] *Segarra Rivera v. International Shipping Agency, Inc.,* 208 DPR 964, 992 (2022).

establecimiento, o en uno distinto, con básicamente el mismo equipo, maquinaria e inventario, produciendo básicamente los mismos productos y/o prestando los mismos servicios, reteniendo el mismo nombre del negocio y marcas comerciales o un nombre similar, siempre y cuando la mayoría de los empleados que laboran en el negocio en cualquier momento durante los seis (6) meses siguientes al traspaso trabajaban para el patrono vendedor al ocurrir el traspaso del negocio[45].

El Tribunal Supremo definió el negocio en marcha "como aquel que se mantiene operando de forma continua y con la expectativa de seguir funcionando indefinidamente"[46]. Para determinar si aplica la figura del traspaso de un negocio en marcha es necesario adjudicar si el adquirente realiza una actividad comercial sustancialmente parecida a las actividades comerciales que realizaba el vendedor[47].

De igual forma, la Ley Núm. 80 dispone que, si se determina que se adquirió un negocio en marcha y el nuevo adquirente continúa con el uso de los servicios de los empleados que trabajaron con el dueño predecesor, se les acreditará el tiempo que estuvieran empleados bajo la pasada administración[48]. En el caso de un despido injustificado posterior al traspaso, el nuevo dueño debe responder por cualquier beneficio que pueda tener el empleado bajo la Ley Núm. 80[49].

**-D-**

La Ley Núm. 80, *supra*, previo a sus enmiendas en el 2005, disponía explícitamente que, cuando el tribunal determinara que el despido se realizó por justa causa, ordenará al patrono a depositar una suma de honorarios no menor al quince por ciento (15%)[50]. Posteriormente en los trámites para enmendar la ley, según discutido en Hernández Maldonado v. Taco Maker, por error o

---

[45] 29 LPRA sec. 185n.
[46] *Montalvan v. Rodríguez*, 161 DPR 411, 458 (2004).
[47] Departamento del Trabajo y Recursos Humanos, Guías para la Interpretación de la Legislación Laboral de Puerto Rico, 1a ed., 8 de mayo de 2019, pág. 146, en https://www.trabajo.pr.gov/docs/Boletines/Guias_Legislacion_Laboral.pdf.
[48] 29 LPRA sec. 185f.
[49] *Íd.*, sec.185f.
[50] *C.O.P.R. v. S.P.U.*, 181 DPR 299, 340 (2011).

inadvertencia se omitió la cantidad mínima del quince por ciento

(15%)[51].

Ahora bien, el Tribunal Supremo analizó el trámite legislativo

y determinó que la intención del legislador fue:

> [M]antener un porciento base – igual o mayor al que decretaba la ley desde 1976 – para el cómputo de los honorarios de abogado que pagaría el patrono en caso de falta de justificación del despido. **Empero, por error o inadvertencia se omitió un porcentaje específico que propicia el propósito** mismo de la Ley Núm. 80, *supra*. En conformidad con lo expresado, el inciso (b) del Art. 11 de la Ley Núm. 80, *supra*, **se debe leer con el quince por ciento (15%) añadido. Esto hasta que la Asamblea Legislativa disponga otra cosa**[52]. (Énfasis nuestro).

Luego de establecer un porcentaje base, se determinó que el

juzgador puede estimar necesario otorgar una suma mayor a la

antes establecida[53]. Para ello, la parte deberá solicitarlo mediante

un memorando juramentado que contenga tanto las horas

trabajadas como la tarifa a cobrar[54]. De modo que se debe elaborar

de la siguiente manera:

> a. *Horas trabajadas y labor realizada*: deberá desglosar el tiempo invertido en el caso y especificar las tareas realizadas. Incluirá el trabajo realizado en revisiones y apelaciones, y en procedimientos administrativos, de ser ese el caso. Véase Parker v. Califano, 561 F.2d 320 (D.C. Cir. 1977).
>
> b. *Tarifa que cobra por hora en este tipo de caso*: el abogado deberá justificar su tarifa aludiendo a su experiencia, preparación y a cuánto se cobra tradicionalmente en ese tipo de casos. Podrá someter declaraciones juradas de otros abogados en las cuales éstos indiquen sus tarifas[55].

Además, se debe tener en cuenta "la novedad y dificultad de

las controversias, [que] de ordinario, requieren más esfuerzo y

dedicación por parte de los abogados"[56]. El TPI tendrá la discreción

para aceptar o modificar la suma reclamada en los honorarios,

podrá utilizar o considerar la experiencia y pericia para determinar

la cantidad de tiempo razonable que se dedicó a cada tarea[57]. De

---

[51] *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 296 (2011).
[52] *Íd.*, pág. 296.
[53] *Íd.*, pág. 297.
[54] *Íd.*, pág. 298.
[55] *López Vicil v. ITT Intermedia, Inc.*, 143 DPR 574, 583 (1997).
[56] *Íd.*, pág. 584.
[57] *Íd.*

igual forma, resulta imperativo que el foro primario consigne "por escrito sus razones para llegar a determinada suma. Sólo de esta manera ese cálculo podrá ser revisable y se evitarán abusos de discreción"[58]. Por último, los tribunales apelativos no podrán intervenir con la determinación de honorarios salvo que exista un abuso de discreción[59].

**III.**

La determinación que nos ocupa está acompañada de una presunción de corrección. Corresponde al apelante colocarnos en posición de apartarnos de la deferencia que otorgamos a los dictámenes del TPI, que es quien ve y escucha a los testigos. Por eso, el apelante no puede descansar meramente en sus alegaciones. Al contrario, este tiene el peso de rebatir la presunción de corrección que gozan las actuaciones de los tribunales de primera instancia.

Para que llevemos a cabo nuestra función revisora, el Tribunal Supremo ha establecido que nuestra intervención con la prueba oral tiene que estar basada en un análisis independiente de la prueba desfilada y no a base de los hechos que exponen las partes. Es por lo que, de ordinario, cuando se señalan errores en la apreciación de la prueba y su admisibilidad, el derecho de apelación implica que el recurso sea perfeccionado mediante alguno de los mecanismos de recopilación de la prueba oral presentada ante el Tribunal de Primera Instancia. En la *Apelación* de autos, se presentó una transcripción de la prueba oral estipulada.

En el presente recurso, hay señalamientos de error argüidos por el apelante que requieren el examen de la prueba oral vertida durante el juicio, a fin de determinar si, en efecto, se pasó o no la prueba constitutiva de que el despido fue uno justificado. Además, debemos analizar el cómputo de la mesada y determinar si la suma

---

[58] *Íd.*
[59] *Íd.*

correspondiente a la mesada asciende a treinta y dos mil quinientos veintiocho dólares con treinta y seis centavos ($32,528.36) por el tiempo que el señor Sánchez trabajó con Fairmont o si, por el contrario, le corresponderá ciento noventa y nueve mil ochocientos diecisiete dólares con cinco centavos ($199,817.05) por el tiempo acumulado que trabajó con El Hotel San Juan. Por último, debemos determinar cuál es el porciento, si alguno, le corresponde por concepto de honorarios de abogado. Fairmont solicita que se revoque la *Sentencia* emitida y se desestime la causa de acción en su contra.

El apelado sostiene que el apelante no pasó la prueba necesaria para establecer la justificación del despido y que su petitorio se basa en alegaciones infundadas. Por otro lado, argumenta que el cómputo de la mesada se rige por el contrato firmado el 3 de enero de 2020, cláusula 1.2, que explícitamente impone que "Your original hire date of 5/31/2000 with El San Juan Hotel will continue to be recognized soley for the purposes of determining your period of services with the Company". Finalmente, solicita que se condene al apelante a pagar el 25% por concepto de honorarios de abogados.

Estudiado y analizado el recurso ante nuestra consideración, particularmente los anejos y la trascripción de la prueba oral estipulada, colegimos que los errores primero, segundo y tercero alegados por el apelante no fueron cometidos. Veamos.

Atenderemos simultáneamente los errores primero y segundo por estar relacionados entre sí. Surge del testimonio de la señora Kerania Olmo que, junto con la señora Mirrem Ubarri, Supervisora del señor Sánchez, le notificaron a este último sobre la suspensión de su empleo mientras se llevaba a cabo una investigación[60]. Del

---

[60] Véase TPO Estipulada, interrogatorio de Kerania Olmo, pág. 6, líneas 11-18 y 24; y el interrogatorio de José Sánchez, pág. 24.

testimonio del señor Sánchez, surge que no se le informó sobre los cargos o las acusaciones que se le imputaban previo al inicio de la investigación[61]. En esta reunión, se le preguntó al señor Sánchez si había compartido información confidencial, lo cual negó por completo[62].

La señora Olmo alegó que el señor Sánchez le admitió que divulgó información confidencial sobre el personal de Miss Mundo[63]. Sin embargo, no surge que se haya plasmado en algún documento oficial. En su testimonio, se limitó a informar que tomó unas notas del proceso[64]. De igual manera, la señora Olmo indicó que, a su entender, se realizaron tres (3) entrevistas, pero ninguna fue llevada a cabo por esta y no tiene conocimiento de quienes fueron entrevistados[65]. Tampoco surge que se haya realizado un informe que hiciera constar el contenido de las entrevistas, una conclusión o determinación final de la investigación[66]. Sin embargo, nuevamente enfatizó que la admisión del señor Sánchez se encuentra en sus notas de esa reunión[67].

> Lcdo. Pavía: Usted no cree que, si ya tiene una admisión verbal, y está documentando una investigación basada en una admisión, ¿usted no cree que debe hab[e]r un documento que diga por escrito la admisión de mi representado?
> Sra. Olmo: [...] yo tomé mis notas.
> [...]
> Lcdo. Pavía: es bien sencilla, si ¿se recogió por escrito la admisión de mi representado?
> Sra. Olmo: No.
> Lcdo. Pavía: ¡No!
> Sra. Olmo: De parte de él, no.
> Lcdo. Pavía: ¿Y usted como directora de la división de recursos humanos, que esta conduciendo una investigación que puede resultar en el despido de un empleado, que dice usted que admitió, no incluye esa admisión por escrito como parte de la investigación?
> Sra. Olmo: No, yo tengo mis notas.
> Lcdo. Pavía: no, no, sus notas, no. Por escrito.
> Sra. Olmo: No.
> [...]

---

[61] Véase TPO Estipulada, interrogatorio de José Sánchez, pág. 13.
[62] *Íd.*, pág. 16.
[63] Véase TPO Estipulada, interrogatorio de Kerania Olmo, págs. 8 y 10.
[64] *Íd.*, pág. 13, línea 19 y pág. 14, línea 12.
[65] *Íd.*, pág. 12.
[66] *Íd.*, págs. 12-13.
[67] *Íd.*, pág. 13, línea 19 y pág. 14, línea 12.

> Lcdo. Pavía: No. Okey. Mire y, y ¿cuántas entrevistas se realizaron como parte de esta investigación que usted hizo?
> Sra. Olmo: Yo personalmente, yo no entrevisté.
> Lcdo. Pavía: Usted no entrevistó.
> Sra. Olmo: No.

Por último, la señora Olmo verbalizó que la determinación la llevó a cabo el grupo gerencial luego de que se realizaran unas recomendaciones[68]:

> Lcdo. Pavía: [...] ¿quién tomó la determinación de despedir a[l señor Sánchez]?
> Sra. Olmo: Pues la gerencia según la, el "management group" según la violación de la compañía y yo pues ejercí la conversación con él.
> Lcdo. Pavía: O sea que esa gerencia tampoco estuvo el beneficio de examinar un informa de investigación porque no existe. Lo que hay son unas notas, ¿verdad que sí?
> Sra. Olmo: Lo que yo este, le indiqué, tuvimos unas reuniones y se dieron unas recomendaciones según las políticas de la compañía.
> [...]
> Lcdo. Pavía: La gerencia tampoco tuvo la oportunidad de ver un informe de investigación porque no existe. Sí, ¿verdad que sí?, que no existe y no lo tuvieron.
> Sra. Olmo: Bueno, del informe de investigación como me lo está diciendo, no. No, no lo.
> Lcdo. Pavía: O sea que lo único que tuvieron fueron las notas suyas.
> Sra. Olmo: Las notas y el, el "statement" de las demás personas. De la persona que...
> Lcdo. Pavía: [...], demás personas que, según usted, solamente una está por escrito, de tres.
> Sra. Olmo: Es correcto.
> Lcdo. Pavía: O sea que el "statement" de las otras tres, la gerencia no se pudo enterar.
> Sra. Olmo: Sí se enteraron. Fue conversaciones.
> Lcdo. Pavía: ¿Se enteraron? De voz de quién, ¿suya?
> Sra. Olmo: No, de las otras personas, pero no lo pusieron por escrito.

Posteriormente, el 10 de febrero de 2021, se citó al señor Sánchez para que acudiera al establecimiento. Según el testimonio del apelado, estuvieron presente la señora Kerania Olmo (señora Olmo) y la señora Mirrem Ubarri (señora Ubarri) para informarle sobre su despido[69]. Sin embargo, hasta ese momento, no le habían notificado las razones para su despido ni le entregaron copia de la investigación[70]:

> Lcdo. Pavía: Mire, antes de terminarlo, de darle la noticia que estaba despedido de su puesto. Le pregunto este ¿alguien en el hotel o la gerencia le notificó copia de la investigación?
> Sánchez: No

---

[68] *Íd.*, pág. 14, líneas 23-29.
[69] Véase TPO Estipulada, interrogatorio de José Sánchez, pág. 14.
[70] *Íd.*, pág. 15.

Lcdo. Pavía: Le pregunto ¿durante el tiempo que estuvo suspendido, alguien se comunicó con usted para hacerlo parte de la investigación y saber la versión suya de lo que sea que le estaban acusando?

Sánchez: Nunca.

Lcdo. Pavía: ¿En algún momento antes de despedirlo, se le notificó el resultado de la investigación?

Sánchez: No.

Lcdo. Pavía: ¿Se l[e] notificó antes del despido a qué personas se entrevistaron o formaron parte de la investigación?

Sánchez: No.

Lcdo. Pavía: Le pregunto ¿usted solicitó información relacionada a todos estos aspectos de esta investigación?

Sánchez: Sí. Cuando me despiden yo le dije que cuál era la razón y me dijeron que no me tenían que decir, Le dije que me dieran copia de, de la investigación y me dijeron que no me tenían que dar ninguna copia y que era una decisión que habían tomado.

Lcdo. Pavía: Le pregunto ¿le entregaron alguna carta de despido a usted que expresara las razones por las cuales le estaban [...] despidiendo de su trabajo?

Sánchez: No.

Enfatizamos que, no surge de la transcripción de la prueba oral estipulada que Fairmont haya presentado prueba que evidenciara la gravedad de la falta alegadamente cometida que ameritara el despido del señor Sánchez. Fíjese que, el testimonio de la señora Olmo demuestra que no tiene conocimiento sobre cómo se llevó a cabo la alegada investigación, pero, que existían unas notas que alegadamente recogían la admisión del señor Sánchez[71].

No obstante, el apelante no presentó evidencia independiente al testimonio de la señora Olmo que evidenciara el proceso de investigación o la determinación final del despido. Testimonio al cual el TPI no le dio crédito.

Debemos señalar que el foro primario determinó que, de existir unas notas del proceso de investigación, estas no se presentaron como evidencia en el juicio. Tampoco consta el testimonio de la señora Ubarri, quien alegadamente estuvo presente en la reunión[72].

Como parte de la discusión de los errores alegados, se señala que el TPI erró al determinar que la señora Pietri participó de la

---

[71] Véase TPO Estipulada, interrogatorio de Kerania Olmo, pág. 12.
[72] Véase TPO Estipulada, interrogatorio de José Sánchez, pág. 24 e interrogatorio de Kerania Olmo, pág. 6.

reunión de despido del señor Sánchez. Específicamente, el TPI consignó es sus determinaciones de hecho que: "El 2 de febrero de 2021 fue notificado de la suspensión de su empleo en una reunión en la que intervino la Sra. Kerania Olmo y la Sra. Jacqueline Pietri". Esto es incorrecto, ya que, de los testimonios vertidos, tanto por el señor Sánchez[73], como por la señora Olmo[74] y la señora Jacqueline Pietri (señora Pietri)[75], surge que esta no estuvo presente en tal reunión. A pesar de que este hecho fue incluido en la determinación emitida por el TPI, ello no resulta suficiente como para revocar el dictamen recurrido. Por lo que, es forzoso concluir que el proceso de despido del señor Sánchez no se llevó a cabo de manera justificada.

Es norma reiterada que la Ley Núm. 80, *supra,* establece que le corresponde al apelante demostrar que el despido se basó en una justa causa, y de no lograr articular una causa justificada para el despido, procede resolver el pleito en su contra e indemnizar al empleado despedido.

Examinada la transcripción de la prueba oral estipulada, colegimos que el apelante no demostró su caso y descansó en meras alegaciones, las cuales no constituyen prueba sustancial para establecer una causa justificada a base de los contornos de la Ley 80, por lo que, este foro intermedio no intervendrá con la apreciación de la prueba establecida por el foro apelado por no existir error manifiesto, pasión, prejuicio o parcialidad.

Referente al tercer error, el apelante esboza que el cómputo de la mesada es errado, debido a que se toma en consideración la fecha de 31 de mayo de 2000, cuando el señor Sánchez trabajó como senior sales and marketing manager en el Hotel San Juan y no la fecha del 3 de enero de 2020, cuando el señor Sánchez firmó el

---

[73] Véase TPO Estipulada, interrogatorio de José Sánchez, pág. 24.
[74] Véase TPO Estipulada, interrogatorio de Kerania Olmo, pág. 6.
[75] Véase TPO Estipulada, interrogatorio de Jaqueline Pietri, pág. 14.

contrato con el apelante para ocupar la posición de director de mercado local en grupos.

Al revisitar la *Sentencia* apelada, surge que en las determinaciones de hecho número 6 al 20, el TPI concluyó que desde el año 2019, se informó que Fairmont estaría encargado de la nueva administración del Hotel. Como parte de la transición, se envió un correo electrónico para coordinar la firma y documentación requerida por Fairmont. Sobre estos documentos, el señor Sánchez preguntó al personal de recursos humanos si mantendrían su "seniority" en caso de un "Lay Off" y si se les honrarían los años de servicio, ya que, a su parecer, se entendía como un "re-hire"[76]. La señora Pietri, en aquel momento asistente de la Directora de Recursos Humanos, le contestó que la fecha de "hire" se mantenía, lo que se entendió era referente al 31 de mayo de 2000[77]. Inconforme, el señor Sánchez inquirió sobre el "seniority" o antigüedad si era desde que había comenzado con el Hotel o desde que firmaron con Fairmont[78]. Lo cierto es que, en su testimonio, la señora Pietri admitió que (no tenía la información y que) no contestó las demás preguntas enviadas por el señor Sánchez mediante el correo electrónico[79] con relación a los temas del "re-hire" en el caso de un "Lay Off" o si serían honrados los años de servicio, es decir, el "seniority". No obstante, cuando se llevó a cabo la reunión, en la que estuvo presente personal afiliado al Fairmont, la señora Pietri, la Sra. Angie Nieves (Gerente de Beneficios de Recursos Humanos) y la Sra. Kerania Olmo (Directora de Recursos Humanos), se reiteró que nada cambiaría[80].

---

[76] *Íd.*, págs. 6-8.
[77] Véase TPO Estipulada, interrogatorio de José Sánchez, pág 7 y el interrogatorio de Jaqueline Pietri, pág. 7.
[78] Véase TPO Estipulada, interrogatorio de José Sánchez, pág. 7.
[79] Véase TPO Estipulada, interrogatorio de Jaqueline Pietri, págs. 9-10.
[80] *Íd*, pág. 9, líneas 38-40.

De modo que, el 3 de enero de 2020, el señor Sánchez firmó el contrato y ocupó la posición de director de mercado local en grupos[81]. Como parte de esto, recibió varios documentos, entre ellos el Código de Ética y Responsabilidad Corporativa y el Manual de Empleado[82]. Sobre la fecha de 31 de mayo de 2000, la cláusula 1.2 del contrato dispone que: **"Your original hire date of 5/31/2000 with El San Juan Hotel will continue to be recognized soley for the purposes of determining your period of services with the Company".** Referente a la posición como Director, Business Travel, el contrato disponía que **"Your position will be Director, Business Travel, Fairmont El San Juan Hotel effective January 3, 2020 (the "Hire Date") although the Company reserves the right to amend your title to accurately reflect your current duties and responsibilities"**.

Resulta importante entonces discutir la figura del traspaso de negocio en marcha. Esta doctrina aplica cuando el nuevo adquirente continúa con los servicios de su predecesor con los fines de operar indefinidamente[83]. Excepto si el negocio permanece inoperante por un término ininterrumpido de seis (6) meses de lo contrario la consecuencia, es si el nuevo adquirente mantiene a los mismos empleados que el anterior, entonces se les acreditará el tiempo que estuvieran empleados por la pasada administración[84].

En el caso de marras, el señor Sánchez trabajó como senior sales and marketing manager en el Hotel San Juan desde el 31 de mayo de 2000. Posteriormente, en el año 2019, se informó que Fairmont estaría encargado de la nueva administración del Hotel San Juan. De modo que, el 3 de enero de 2020, el señor Sánchez firmó el contrato y ocupó la posición de director de mercado local en

---

[81] Véase TPO Estipulada, interrogatorio de José Sánchez, pág. 18.
[82] *Íd.*, págs. 21–23.
[83] *Montalvan v. Rodríguez*, 161 DPR 411, 458 (2004).
[84] 29 LPRA sec. 185f.

grupos. Entiéndase que, mediante la transición interna, el hotel nunca cesó sus operaciones. Más adelante, el 2 de febrero de 2021, la señora Kerania Olmo, Directora de Talento y Cultura, y la señora Mirrem Ubarri, supervisora del señor Sánchez, le notificaron a este último sobre la suspensión de su empleo mientras se llevaba a cabo una investigación. Ante ello, colegimos que existe una similitud sustancial entre las identidades comerciales del patrono vendedor y del adquirente en términos de la actividad comercial que se realiza por el nuevo administrado[85]. Al aquilatar la prueba presentada en el TPI determinamos que el Fairmont retuvo los empleados del patrono anterior, por lo cual adquirió un negocio en marcha. La consecuencia de esta adquisición es que, para los fines del cómputo de la mesada, el señor Sánchez tiene derecho a que se le acredite el tiempo que llevaba trabajando en el Hotel San Juan. Así pues, el cálculo de la mesada asciende a ciento noventa y nueve mil ochocientos diecisiete dólares con cinco centavos ($199,817.05) y se toma en consideración desde el 31 de mayo de 2000. El tercer error no fue cometido.

Por último, en su cuarto error, el apelante alega que el TPI erró al aumentar los honorarios de abogado y no fijarlos al quince por ciento (15%). Fairmont entiende que la Ley Núm. 80 impone un límite del quince por ciento (15%) por concepto de honorarios. Le asiente la razón. Veamos.

El Tribunal Supremo ha resuelto según que intención legislativa que la Ley Núm. 80 contempla un porcentaje mínimo a otorgar en concepto de los honorarios de abogado. Luego de establecer un porcentaje base, se determinó que el juzgador puede determinar necesario otorgar una suma mayor a la antes

---

[85] Departamento del Trabajo y Recursos Humanos, Guías para la Interpretación de la Legislación Laboral de Puerto Rico, 1a ed., 8 de mayo de 2019, pág. 146, en https://www.trabajo.pr.gov/docs/Boletines/Guias_Legislacion_Laboral.pdf

establecida[86]. Para ello, la parte deberá solicitarlo mediante un memorando juramentado que contenga tanto las horas trabajadas como la tarifa a cobrar[87]. De otorgar un porcentaje mayor al del estatuto, es necesario que el TPI consigne por escrito las razones para otorgar tal suma. Únicamente así los tribunales apelativos podrán revisar el cálculo. Entiéndase que, sin el análisis por escrito del TPI, no se podrá revisar la adjudicación de los honorarios en este caso.

Luego de un análisis del expediente, no surge que la parte apelada haya sometido un memorando juramentado que justificara su solicitud de un veinticinco por ciento (25%) en concepto de honorarios. Inclusive, la solicitud de honorarios ascendente al veinticinco por ciento (25%) consta únicamente en la *Querella*. En la revisión de la *Sentencia* emitida por el TPI tampoco constan las razones que dan lugar al otorgamiento de un porcentaje mayor al establecido en ley. Por lo que no podemos revisar los motivos o razones por los cuales el TPI estimó apropiados el cálculo de honorarios a un veinticinco por ciento (25%).

Es por ello que, concluimos que el TPI abusó de su discreción al imponer el pago de honorarios en exceso del quince por ciento (15%) establecido en nuestro ordenamiento jurídico. Ello así, pues el señor Sánchez no presentó un memorando juramentado con el detalle de las horas trabajadas y la tarifa a cobrar. Conviene añadir, que contrario a la normativa aplicable, el TPI tampoco justificó por escrito, su decisión de conceder honorarios de abogado al veinticinco por ciento (25%) de la cuantía concedida. En vista de lo anterior, procede reducir la partida de honorarios a quince por ciento (15%) de la compensación concedida.

---

[86] *Íd.*, pág. 297.
[87] *Íd.*, pág. 298.

**IV.**

Por los fundamentos antes expuestos, se ***modifica*** la sentencia apelada a los fines de reducir los honorarios de abogado a un 15% de la cuantía concedida y, así modificada, se ***confirma***.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones